STRIÑE, Chief Justice, dissenting, with SEITZ, Justice, joining: I. We respectfully, dissent. To begin to explain why, we underscore what this case is about. The Majority sets aside a forty-year-old policy of the Division of Parks and Recreation of the Department of Natural Resources and Environmental Control (“DNREC”) that prohibits firearm possession in our State Parks, except for lawful hunting in designated areas or with prior written approval of the Director of DNREC, and a fourteen-year-old policy of the Department of Agriculture (“DOA,”' and together with DNREC, the “Agencies”) that prohibits firearm possession in our State Forests, except for legal hunting[1], or when otherwise waived for-a special situation (each a “Regulation,” and together, the “Regulations”).[2] The Parks and Forests to which these longstanding Regulations apply are havens of recreation, relaxation, and education for Dela-ware families and children, offering school field trips,[3] slimmer camps,[4] recreational activities, including hiking, biking, boating, ice skating, cross-country skiing, bird watching, and horseback riding,[5] and overnight trips to Cape Henlopen that have been a rite of passage for generations of Delaware students.[6] They also serve as a site for school, youth, and adult sporting events.[7] What is. unusual about this decision is that the Majority has discovered that Article I, Section 20 of our State Constitution (“Section 20”), the 1987 amendment providing for an individual right to bear arms, invalidated these decades-old Regulations. Neither the enactors of Section 20, nor anyone in Delaware, recognized that Section 20 affected the state’s ability to regulate firearm possession on its own land until the appellants filed suit twenty-eight years after Section 20’s adoption,[8] inspired by federal decisions interpreting the Federal Constitution. This decision is unusual in' other respects, too. The 1977 Park Regulation prohibiting the possession, display, or discharge of firearms in Parks was not novel, but rather followed a lineage of Delaware park policies dating back to at least 1887.[9] And the 1979 Forest Regulation prohibiting firearm use except by licensed hunters for game in season, as amended in 2003 to prohibit. firearm possession, is derived from hunting restrictions dating back to at least 1911,[10] some of which are still in effect today.[11] The Regulations were kept in place through the administrations of many governors from both political parties who did not recognize the seismic effect of Section 20 on their constitutionality. For example, Governor Castle, who was Senate Minority Leader when the Park Regulation was adopted by Governor DuPont’s administration in 1977, Lieuténant Governor in Governor DuPont’s second term when the Forest Regulation was last promulgated before the adoption of Section 20 in 1984, and Governor at the time of the adoption of Section 20 in 1987, kept the Regulations in place throughout his eight-year tenure.[12] There is a reason for that: When adopted, no one thought Section 20 would affect existing laws and regulations, including these longstanding Regulations. And no one conceived or intended that Section 20 would bar the government from restricting firearms on state property. In amending the Delaware Constitution to adopt Section 20, the General Assembly did not intend to create new rights, repeal existing firearm laws, or limit its power to manage its own land. Rather, as the legislative history shows, the General Assembly intended to protect the status quo as it existed in 1987.[13] So what is this case about? It is about a desire to read the Delaware Constitution in conformity with federal decisions that were not issued until 2008 and 2010: to wit, District of Columbia v. Heller and McDonald v. City of Chicago.[14] Heller and McDonald gave the Second Amendment, a much broader reading and reversed interpretations of the Second Amendment by the Supreme Court of the United States that were well over a century old. These cases were first used as a gloss on our own Constitution in this Court’s decision in Doe v. Wilmington Housing Authority, which answered certified questions from the United States Court of Appeals for the Third Circuit[15] In Doe, this Court addressed to what extent our state government, as a landlord, could restrict the ability of its tenants to carry weapons for self-defense in common areas that it considered to be extensions of the home where the residents had to go to do daily chores like laundry. And although Doe purported to give Section 20 a broader meaning than the Second Amendment because of Section’s 20 different text—an interpretation unnecessary to decide the case before it— the analysis in Doe was in essence identical to the revised interpretation Heller and McDonald gave to the Second Amendment. Consistent with Doe’s embrace of Heller and McDonald, Doe gave limited consideration to our state’s own history of gun regulation and to the limited purpose behind the adoption of Section 20. It was only after Doe that this suit was filed, in which the appellants urge us to read our own Constitution to restrict our government’s ability to control firearm possession and use, even on its own land, further than the Second Amendment does. The Majority embraces Heller and McDonald and uses them as the foundation for their holding that Section 20 invalidated longstanding practices in park regulation, while giving little weight to the text and history bearing on our Constitution’s meaning. The reality is that, rather than examine what the text of Section 20 means and how it was understood when it was adopted, the Majority has given Section 20 a federal coat of paint, a gloss of meaning more derived from Washington, D.C. than Dover, Delaware. Absent the process of epiphany about the meaning of our Constitution triggered by Heller and McDonald, the Regulations would have continued to operate without controversy. As we show, neither the text of Section 20 nor its history suggests that it altered the historical understanding that our state government, through our elected officials, could determine whether and when firearms could be possessed on state property, and who could possess them. Likewise, nothing in Section 20 or our history suggests that our state government cannot create Parks and Forests as havens for recreation, relaxation, and education where firearm possession and use is restricted. No one has the right to bear arms on another’s property without their consent, and it was long recognized that the government could restrict possession in certain sensitive places, like Parks and Forests. In fact, as of 1977, firearms had been prohibited in one of the state’s crown jewel parks for ninety years.[16] And, since 1938, the federal government had prohibited gun possession within national parks.[17] But even if the Regulations prohibited conduct protected by Section 20, we would dissent. Under Heller and its progeny, the Regulations regulate sensitive areas, and thus are lawful. The notion that our gov-eminent, as a proprietor, may determine that certain areas are sensitive and should be firearm-free was well understood in Delaware, and throughout the United States. It is therefore not surprising that for the forty years since the earliest of the Regulations was adopted in 1977,[18] no one in the General Assembly sought to introduce a bill overturning them, and no one claimed they violated our Constitution or the Second Amendment. And even if they were not regulations of sensitive places, the Regulations would survive heightened scrutiny. Contrary to the Majority’s characterization of the Regulations as a “total ban”[19]—a label it borrows from Heller[20]—the Regulations do not ban firearm possession statewide or even citywide, and are therefore distant from the citywide bans at issue in Heller and McDonald.[21] The Regulations affect only three percent of the land in Dela-ware.[22] And they are not even a total ban within the three percent occupied by Parks and Forests because they, facilitate access to firearms for lawful hunting and allow for waiver through an application for special permission, which could be used if a group wished to use a Park for. a marksman’s competition, or if, say, an FBI agent who does undercover work wished to bring a weapon into a Park because of her special need for personal protection.[23] The Regulations serve an important governmental purpose and do not burden appellants’ Section 20 rights' more than necessary. When people come together in Parks and Forests for games and recreation, emotions can run high. When folks camp, they sometimes drink,[24] including at events within the Parks like beer and wine festivals.[25] When folks drink and carouse, they sometimes get jealous and angry. When folks play or attend sporting events, spirits run high and sometimes, out of control. When folks get emotional around guns, things can get dangerous fast. When folks camp, there are no gun lockers, and they are near other visitors.[26] There are no natural boundaries in Parks and Forests signaling areas where park-goers can find safety from gunfire or natural barriers that stop ‘flying bullets or arrows. These and other common sense reasons support the decisions of generations of governors and cabinet secretaries that the Regulations advance the public purposes served by our Parks and Forests, ánd facilitate the safe enjoyment of these public spaces by families and children. Underscoring this reality are the briefs of the appellants and their friends in ami-cus that argue without evidence that our Parks and Forests are now dangerous places because of .the Regulations.[27]- We live in a state with a. 'crime rate higher than the national average.[28] Our' major city has a crime rate higher than that of Los Angeles and New York City[29] and its children are more at risk of being victims of gun violence than those in any other American city.[30] Given this backdrop, one would expect the appellants and their, friends in amicus to be able to show that the Regulations have manifested themselves in a pattern of violent harm to visitors and a higher violent crime rate in our Parks and Forests than in other areas of our State. Instead, their adjectives and adverbs find themselves accompanied by one fact; an unsolved murder with its victim discovered in Blackbird State Forest in 1986.[31] One. That suggests the Regulations should not be disturbed by the Judiciary, and that we should trust the judgment of generations of elected governors and their cabinet secretaries to oversee state land and protect those invited to use it on a shared basis. Our General Assembly is well-positioned to constrain any overreaching by them. That a bill has never even been introduced to do so since 1987 suggests that we are overriding a durable, bipartisan, and sensible policy consensus. n. To explain why we would find the Regulations valid under the Delaware Constitutions we proceed as follows: In Section III, we examine the 1776 and 1792 Delaware Constitutions and the fact that their framers did not adopt a constitutional right to bear arms.. Instead, they left it to the General Assembly to address the extent to which Delawareans could bear arms. We illustrate in Section IV, by reference to specific instances of lawmaking and regulation, that Delaware has long regulated to .what extent, where, and when , firearms could be possessed and used. Likewise, we show that Delaware has long recognized the right of property, owners, to. decide whether firearms could be. possessed on their property. This understanding included the notion that the government could regulate firearm possession on its own lands., including within; its Parks and. Forests. . In Section V, we address the circumstances the Agencies faced when they adopted the Regulations and why those decisions were presaged by prior regulation and not controversial. Then, in Section VI; we address Section 20, which added to the Delaware Constitution the right to keep and bear arms that is the focus of this case. We address its limited purpose, and in particular, the lack of any purpose on the part of its drafters to disturb longstanding restrictions on firearm possession and use on government property. The General Assembly intended to codify the existing status quo: No one thought or intended that Section 20 would limit Delaware’s power to regulate firearm possession and use on its own' property, like any other proprietor may! We note that, in 1.981, Kent County adopted an ordinance like the Regulations that prohibited the possession and use of firearms in its county parks, and the absence of any suggestion that Section 20 invalidated that ordinance. In Section VII, we address the implications of silence: the three decades following the adoption of Section 20 when there was no constitutional or administrative challenge to’ the Regulations, no bill filed to overturn the Regulations, and no directive from the Governor to do so. In fact, any legislative action taken during this period'-confirmed the constitutionality of the Regulations. And, in 1998, New Castle County adopted the same policy as the Regulations by prohibiting the possession and use of firearms in its parks. In Section VIII, we address what began the process of discovery that resulted in this suit: the federal decisions • of Heller and McDonald. We do not think that Delawareans need these federal cases—postdating our adoption of Section 20 by twenty-one years—to tell us what it meant when it was adopted almost a generation earlier. In Section IX, we note that even in the wake of these federal decisions, there was no action challenging the constitutionality of the Regulations under either the State or Federal Constitution. Rather, this case was only filed after this Court answered a question certified by the United States Court of Appeals for the Third Circuit in 2014.[32] In Doe, this Court embraced the analysis in Heller and McDonald, reading them into the Delaware Constitution and inspiring the appellants’ discovery that the longstanding Regulations violated Section 20. But, even after Doe, the General Assembly adopted legislation that accepted the Regulations as state policy on two occasions. Finally, in Section X, we give context to the Regulations by explaining the role of our Parks and Forests in the lives of Delawareans. We then show that the Regulations do not burden conduct protected by Section 20. We also explain how, even if the Regulations do burden conduct protected by Section 20 and the federal cases the Majority relies upon apply, the Regulations are lawful as regulations of sensitive places and, in any event, survive heightened scrutiny. III. From the Majority decision, it might be confusing whether we are addressing a case arising under a Delaware constitutional amendment adopted in 1987, Second Amendment decisions issued by federal courts in 2008 and 2010, or the State Constitution, first adopted in 1776. We start with the latter suggestion, which rests on the odd notion that Dela-ware’s decision not to create a constitutional right to bear arms amounted to a recognition that there was an unwritten right to bear arms that could not be altered by the General Assembly, the common law, or local regulation authorized by the General Assembly. To show why this is not convincing, we begin with the obvious. Delaware’s 1776 Constitution did not include a right to bear arms. And the drafters of Delaware’s 1792 Constitution debated whether to adopt a constitutional right to bear arms, but decided not to do so. A. Delaware’s first Constitution,-adopted in 1776,[33] did not include a right to bear arms, but three provisions evidence the state’s understanding that it could regulate firearm possession and use: i) Article 24, which continued the acts of the General Assembly in force,[34] including prohibitions on dueling and riots;[35] ii) Article 25, a placeholder that continued the then-existing common law of England while the details of the Constitution could be filled out,[36] including the prohibition on “riding or going armed with dangerous or unusual weapons”;[37] and in) Article 28, which prohibited the carrying of arms to the first election of the General Assembly, to be held in the county courthouses.[38] Dela-ware’s first Constitution thus recognized existing firearm laws and restricted the possession of arms on sensitive government property. The Majority references Article 25 to support the notion that Delawareans understood a right to bear arms “even before the founding.”[39] That Article states: The common law of England, as well as so much of the statute law as have been heretofore adopted in practice in this state, shall remain in force, unless they shall be altered by a future law of the Legislature; such parts only excepted as are repugnant to the rights and privileges contained in this constitution and the declaration of rights, & c. agreed to by this convention.[40] Article 25 made up for the original Constitution’s brevity, which contained only thirty articles,[41] and protected individual rights until the General Assembly had the opportunity to draft its own bill of rights.[42] In 1792, the General Assembly made the anticipated changes and removed Article 25.[43] The removal of Article 25 did not revoke the application of English common law in Delaware, but rather, reinforced the understanding that the Delaware General Assembly’s creation of its own Constitution and statutes.would take primacy over English law.[44]. B. Delaware based its ’Bill of Rights in the 1792 Constitution on English common law and Pennsylvania’s Constitution.[45] Although both English common law and the Pennsylvania Constitution included a right to bear arms, Delaware rejected a proposal to include one.[46] The constitutional convention delegates debated a provision protecting an individual right to bear arms, and considered at least four versions of such a provision. The first proposal, identical to the 1790 Pennsylvania provision,[47] stated: “The Right of the Citizens to bear Arms in. defence of themselves and the State, shall not be questioned.”[48] This conception of an unqualified right was met with amendments that would have added important provisos, including limiting the right to those “acting in strict subordination to the Civil Power,” “qualified to vote for Representatives,” and who did not “disturb the Peace and Happiness, or Safety of Society.”[49] This Court acknowledged this history in Doe, observing: In 1791, Delaware delegates to the state constitutional convention were unable to agree on the specific language that would codify in our Declaration of Rights the right to keep and bear arms in Delaware. After several attempts, the effort was abandoned. ^Concerns over groups of armed men stood in the way of an agreement even though there was an apparent consensus among the delegates on an individual’s right to bear arms in self-defense. Not until almost 200 years later did the Delaware General Assembly agree on the language to be used.[50] But then still concluded: Although Section 20 was not enacted until 1987, Delaware has a long history, dating back to the Revolution, of allowing responsible citizens to lawfully carry and use firearms in our state.... Like the citizens of , our sister states at the founding, Delaware citizens understood that the “right of self-preservation” permitted a citizen to “repe[l] force by force” when “the intervention of society in his behalf, may be too late to prevent an injury.” An individual’s right to bear arms was “understood to be an individual right protecting against both public and private violence.” The right to keep and bear arms was also understood to exist for membership in the militia and for hunting.[51] To us, it is not surprising that Delaware did not adopt a constitutional right to bear arms. Aside from the concern that a situation could arise where the national government would prevent states from raising militias—a concern with origins in the struggle for independence from England— there was no plausible reason to believe that the political process would not address firearm possession and use in a fair manner. And as we shall soon discuss, the English tradition did not bar Parliament— the equivalent of our General Assembly— from regulating gun possession and use. The drafters’ decision not to constitu-tionalize any right to weapons means that any claim of right was subject to regulation by the ordinary political process. Doe’s dictum suggesting that the failure to agree on a right reflects a “consensus” that it existed,[52] to us, turns history and law upside down and has an Orwellian character. The supposed originalism of some is supposed to be based on what constitutional text says and was understood to mean, not to ground constitutional rights in absent text.[53] Turning our founders’ decision not create a constitutional right to bear arms into evidence of a fundamental right immune to legislative regulation is not only inconsistent with principles of legislative interpretation, it is belied by the actions of generations of Delawareans that followed. They often legislated to restrict weapons possession and use, unconstrained by any belief that they were compromising an unwritten state constitutional right. Our friends in the Majority ground an unwritten right to bear arms in our English law heritage.[54] But the English regulatory tradition does not support the notion that our founders considered our English law heritage to be the source of an unwritten right to bear arms.[55] In fact, one of the only things the nine federal Justices who were split five-to-four in Heller agreed on was that any right to bear arms in England was subject to restriction by Parliament.[56] Nor can it be thought that the drafters of our Constitution relied upon the Second Amendment to the Federal Constitution as a substitute for á state constitutional right to bear arms. By its plain terms, the Second Amendment was a restraint on federal—not state—action, and understood as such in 1792.[57] Thus, as of our state’s founding, there was no constitutional right to bear arms, and the General Assembly had the responsibility of regulating gun possession and use. IY. In keeping with the decision to not create a constitutional right to bear arms and with the English tradition of regulating gun possession and use, Delaware lawmakers early on regulated where, when, and what weapons could be possessed within our State. Likewise, Delaware respected that proprietors, including the government itself, could restrict the possession and use of firearms on their own property. And one prominent example of that understanding involved a ban on firearm possession in a key public park. A. We touch on some of this history now, beginning with one of the earliest regulations of where guns could be used. In 1812, the General Assembly prohibited the firing of firearms within the limits of any town,[58] later enacting a form of the English Statute of Northampton under which: “Any justice of the peace may also cause to be arrested ... all who go armed offensively to the terror of the people, or are otherwise disorderly and dangerous”[59] and which prohibited the firing or discharge of any firearm in any public place in the State.[60] With the authority of the General Assembly, municipalities also regulated firearms. Wilmington prohibited discharging firearms within its city limits, except on days of public rejoicing,[61] as well as target shooting within town limits or “at any place of public resort” unless the location was surrounded by walls at least ten feet high and four inches thick.[62] Likewise, Dover prohibited the discharge of firearms within the town limits.[63] B. As did the rest of the United States,[64] Delaware respected the rights of real property owners—including private landowners and the government itself—to control their land and the conditions on which visitors could enter. For example, “willfully entering] into, upon, or trespassing] upon [a private landowner’s] ways, lands or premises” was a nuisance in Delaware.[65] Private landowners could prohibit hunters with firearms from entering their property, and state law made disobeyanee a violation of state law, just as the State prohibited trespass on state property for certain private uses.[66] C. This- established history of respecting private property extended to parks controlled by the government and is evidenced by state regulations limiting possession and use of weapons in those parks. History belies the idea that late twentieth century state policymakers were the first to regulate Parks and Forests as places for recreation in which possession and use of firearms might be inconsistent with the public purposes of the land. The state’s administrative structure at this time employed the “hydra-headed commission system of administration,”[67] with local commissions performing public administrative functions outside of the control of the Governor.[68]- As early as the 1860s, a Brandywine Park in Wilmington was contemplated because of its potential to “raise land values throughout the city and ... to improve ‘the culture, taste and morals of the community’ ” by addressing the absence of “a place where the mothers with their children, or the aged people can stroll, away from the noise and dust of the city, without being trespassers.”[69] To address this need, the General Assembly created the Board of Park Commissioners of Wilmington in 1883 “for the purpose of providing and maintaining one or more open places or parks for the promotion of the health and recreation of the people of the City of Wilmington and its vicinity”[70] and to “provide a contrast to the existing city, a. refuge from its noise, its oppressive darkness, from the crowdedness and the inhuman surfaces of the streets.”[71] The General Assembly itself established some regulations for Wilmington city parks in 1883,[72] and under delegated authority from the General Assembly,[73] the Board of Park Commissioners of Wilmington established additional regulations governing visitor conduct in its parks in 1887, one of which stated: “No person shall carry fire-arms or shoot. birds or other animals within the Park, or throw, stones or missiles therein. Penalty, $5.00.”[74] The 1898 park rules stated: “No person shall carry firearms, shoot birds, or .other animals, nor throw stones or other missiles, or. in any way disturb .or annoy the birds or animals within the boundaries- of the Park.”[75] These Wilmington rules were consistent with the federal government’s emerging approach: • In 1872⅛ the federal government prohibited the use of guns while killing or trapping wild animals;[76] ■ and • In 1938, the Department of the Interior prohibited the possession and use of firearms in all national parks, except with written' permission.[77] In that same era, Delaware began developing a statewide park system, establishing in 1937 the State Park Commission,[78] whose responsibilities were later assumed by DNREC, which the General Assembly authorized to establish rules and regulations governing Parks.[79] The State Park Commission regulated firearms within Parks, prohibiting hunting on land under its jurisdiction as directed by the General Assembly.[80] By 1951, it appears that the State Park Commission had moved toward the federal policy of prohibiting firearm possession in Parks.[81] In 1962, a unanimous State Park Commission adopted a rule prohibiting the possession, display, and discharge of firearms in any Park.[82] And in 1968, the General Assembly allowed hunting in certain Park areas designated by the State Park Commission,[83] which, in response, revised its rules to reflect this change.[84] A year later, the General Assembly began transitioning Park management to DNREC, led by a Secretary the Governor appointed with the advice and consent of the Senate.[85] During the twentieth century, the State also developed structures and policies for governing its Forests, first through the State Board of Forestry, established in 1909,[86] and through the DOA after 1974.[87] As was the case with Parks, firearms were regulated in Forests, with the first prohibition on use dating back to 1911.[88] D. The General Assembly’s regulation of firearms was not, of course, limited to where guns could be possessed and used, much less to firearm restrictions in Parks and Forests. The General Assembly also regulated the manner in which Delawareans could possess and use weapons throughout the State. For example, the General Assembly banned the carrying of concealed deadly weapons for thirty years “on the ground of public policy and for public protection” to remove the “temptation and tendency to use it under excitement.”[89] The General Assembly also banned the intentional pointing, “either in jest or otherwise,” of a firearm on similar grounds.[90] In 1911, the General Assembly tempered this concealed carry prohibition by creating a limited exception that allowed the Court of General Sessions to grant licenses for concealed carry.[91] But Delaware courts did not view this licensing scheme as a broad mandate to allow exceptions to the broader restriction on concealed carry. The Court of General Sessions refused to allow introduction of evidence of a need for self-defense as a justification for carrying a concealed deadly weapon without a license because “[t]o hold otherwise would be to aid and encourage the very common and dangerous practice of carrying concealed deadly weapons, and permit any one to indulge in such practice who is willing to swear that he did it for self-defense.”[92] And lawful reasons for concealed carry continued to be interpreted as “specific, and, in a sense, temporary.” [93] In the late nineteenth and early twentieth centuries, the General Assembly also regulated who could bear arms, prohibiting “tramps” from possessing a firearm,[94] and restricting “unnaturalized foreigner[s]” and minors from possessing a firearm while hunting,[95] And by 1968, the General Assembly had prohibited firearm possession by persons convicted of a felony, crime of violence, or unlawful use or possession of drugs; and persons committed to a mental institution.[96] Delaware also regulated the types of' weapons its citizens could cany, prohibiting while hunting “any device or instrument known as a swivel or punt gun, or with any gun other than such as are habitually raised at arm’s length and fired from the shoulder,” and making possession of these guns while in possession of a protected animal prima facie evidence of poaching.[97] And beyond the realm of hunting, the General, Assembly prohibited air guns, spring guns, and maximum silencers.[98] . E. As the careful reader has no doubt noticed, our discussion has not focused on the Second Amendment. This is for a good reason. Throughout the period 1792 to 1977, the Second Amendment was irrelevant to the question of whether and under what conditions Delawareans could use and possess deadly weapons. The Supreme Court of the United States held on multiple occasions that the first eight amendments did not apply to the states.[99] Clarifying that this meant that the Second Amendment did not apply to the states, the Supreme Court held in Cndk-shank in 1875 that the Second Amendment only declared that the right to bear arms for a lawful purpose shall not be infringed by Congress.[100] And in 1886, the Supreme Court in .Presser held that the Second Amendment “is one of the amendments that has no other effect than to restrict the. powers of the national government.”[101] In 1894; the Supreme Court in Miller v. Texas again ' stated that the Second Amendment “operate[s] only upon the federal power, and [has] no reference whatever to proceedings in state courts.”[102] And in the 1939 United States, u Miller decision, which remained the Supreme Court’s leading Second Amendment decision into the mid-twentieth century, the Court further held that the Second Amendment only prevented the federal government from infringing the rights-of states to raise militias.[103] . F. Because the Majority relies upon our English heritage to justify their decision to overturn the Regulations, we pause to show the state of firearm regulation in England as of 1977.[104] But this reliance is surprising given the 'reality that the English tradition was that any right to bear aims was subject to legislative sufferance.[105] In fact, England’s regulation of firearm possession and use during the nineteenth and twentieth centuries was more stringent than Delaware’s. To condense this history, by 1977, England had; i) given constables the- authority to search and seize weapons “kept for a purpose dangerous to the public peace”;[106] ii) created a national gun registration system;[107] iii) restricted - the sale of guns to “unfit” persons; [108] and iv) required certificates issued by local police to purchase, possess, use, or carry any firearm or ammunition.[109] As of 1977, no Delawarean would have found any support in the English tradition for the idea that our Constitution’s failure to create a constitutional right to bear arms precluded legislation regulating gun possession and use. To complete this part of our story, since 1977, England’s firearm regulations have become even stricter, resulting in a near prohibition on the.ownership of handguns and Automatic weapons.[110] Lawful firearm possession in England today is subject to registration and storage requirements,[111] as well as the requirement that owners provide a “good reason,” beyond self-defense, to secure a license to possess a firearm.[112] England enacted these restrictions without believing itself constrained by the existence of any constitutional or inalienable right to own a firearm and carry it anywhere, much less on government property, free from legal restraint. At the same time, this continuation of stringent regulation has resulted in lower violence rates than those in Delaware[113] and the United States,[114] where gun regulation is less stringent. Meanwhile, England’s proud hunting tradition still thrives.[115] Y. In 1977, there was no reason for DNREC to view adopting a regulation restricting the possession and use of firearms within the state’s own Parks and Forests to be controversial. As we have shown: • There was no Delaware state constitutional right to keep or bear arms;[116] • The Second Amendment to the Federal Constitution did not apply to the states, but rather, was interpreted to only prevent federal action that would impair the states’ right to form militias; [117] • There was an established history in Delaware of regulating where, to what extent, in what manner, and what types of weapons could be used;[118] • There was an established history of respecting private property and the rights of property owners to determine the conditions on which anyone could enter their property; and[119] • This established history of respecting private property extended to parks controlled by the government,, as exemplified by the City of Wilmington’s 1887 ban on firearms in its parks, the federal government’s 1938 ban on firearm possession in the national parks, and the State Park Commission’s own prior regulations, including its 1962 prohibition on the possession and use of firearms in Parks.[120] To summarize, in 1977, it was understood that the government could establish parks, condition access to them on entry and conduct requirements, and limit the activities that people might do on its property. By way of example, we do not quibble with the proposition that in the state of nature, human beings fashioned weapons and used them to protect themselves in the case of attacks by wild animals and to kill them for food. But, to survive, human beings also did other things one can think of as fundamental. For example, they used fire to stay warm long before bearing firearms. But consideration of Smokey the Bear makes clear that when you enter a public park, however beautiful and however natural, you are not in the state of nature. You are using a public park established by a republican democracy and must follow the rules it set for its use, whether that means not lighting a fire for warmth when the rules prohibit that or not carrying a gun to fight off wildlife when you are not allowed to do so. If you don’t like the rules, then you don’t have to go into the park. In 1977, this was not a controversial proposition in Delaware or the United States. A. DNREC’s 1977 Park Regulation made it unlawful to display, possess or discharge firearms of any description, air rifles, B.B. guns or sling shots upon any lands or waters administered by the Division, except those persons lawfully hunting in those areas designated for hunting by the Division, or except with prior written approval of the Director or his authorized agent.[121] This sentiment was reiterated in the section on hunting, which stated: “It shall be prohibited to possess or discharge a rifled firearm on State Park lands or waters at anytime [sic]. No firearm, other than a shotgun, may be used for hunting on areas designated for hunting within State Park land's.”[122] DOA followed DNREC’s lead by including’in its first forest rules a regulation restricting firearm use. The first version of the Forest Regulation, promulgated in 1979 and governing Blackbird State Forest stated: “The discharge or use of a firearm of any sort is prohibited, except by licensed hunters for game in season. No target shooting is permitted at áhy time.”[123] , The Agencies exercised the state’s rights as a proprietor to restrict certain conduct on its property through the promulgation of the Regulations, which had the. effect of law and included modest penalties set by the General Assembly,[124] as well as doing things like setting the hours Parks and Forests were open to the public, restricting where fires could be built and how many consecutive days campers could stay, and charging entrance fees.[125] B. In light of this long history of firearm regulation, it is unsurprising that the adoption of the Regulations did not inspire protest. We note that, when the Regulations were adopted in 1977 and 1979, they were subject to review under Delaware’s Administrative Procedures Act (“APA”). A challenge under the APA could have been mounted within thirty days of the Regulations’ adoption on the basis that they were arbitrary and ■ capricious, or contrary to law.[126] But in the years after 1977 and 1979, no administrative challenge was mounted; no constitutional challenge was mounted; and no action was taken by the General Assembly suggesting the adoption of the Regulations was beyond the scope of the Agencies’ delegated' authority. That the Regulations were uncontroversial is explained by their consistency with longstanding firearm restrictions and their purpose in facilitating the function of the Parks and Forests as safe, shared havens for families and individuals for relaxation, recreation, and enjoyment, of the outdoors.[127] The uncdntroversial nature of the Regulations is also evidenced by the status of similar regulations in national parks. Between 1977 and 1987, the national parks continued to ban firearm possession,[128] and there was no suggestion the Second Amendment was inconsistent with that policy.[129] Closer to home, in 1981, Kent County demonstrated the acceptance in Delaware of park regulations restricting the possession and use of firearms. That year, Kent County prohibited firearm possession in its parks: Carrying or possessing, while in any area covered by this part [i.e., Kent County Parks], a gun, air gun, bow and arrow, sling, dart, projectile thrower, knife with blade more than three inches long or any other dangerous, weapon is prohibited, provided that nothing in this section shall be construed as to prevent the use of target ranges and the use of bows and arrows by park visitors on officially established' arqhery ranges.[130] VI. To understand Section 20’s genesis and intended effect/it is important to understand the status of Second Amendment jurisprudence as of the adoption of Section 20. As of 1987, the leading Supreme Court decision held that the Second Amendment only applied to the federal government and protected the states’ right to form militias.[131] That, is, the Second Amendment was-not understood to create a personal right to bear arms for the purpose of self-defense or hunting, or to apply to the states. Gun rights advocates, most notably the National Rifle Association (“NRA”), opposed these longstanding interpretations of the Second Amendment[132] and campaigned for state constitutions to provide a personal right to bear arms, unconnected to any militia purpose, that would be enforceable under state law.[133] As we will discuss, as an adjunct to this movement, gun advocates also sought to pass state laws preventing local - governments from adopting jurisdiction-wide regulations of firearm possession and use within the borders of their counties, cities, or towns that would undercut state constitutional protections and otherwise regulate gun possession and use in a more stringent fashion than state law.[134] By the time Delaware amended its Constitution in 1987 to add Section 20, the NRA’s lobbying had resulted in the adoption of constitutional amendments of this kind in six states.[135] It was as part of this movement that Delaware came to adopt Section 20, proposed at the behest of the Delaware State Sportsmen’s Association (“DSSA”), the local affiliate of the NRA and one of the appellants in this case.[136] A. The proponents of what became Section 20 took care to address the concerns we just noted. They took a coordinated, two-pronged approach. The first thing they did was to introduce a bill that limited the ability of local Delaware governments, such as counties and municipalities, to regulate gun possession and use on a jurisdiction-wide basis (the “Preemption Bill”).[137] The Preemption Bill was introduced and passed in 1985, ahead of the introduction of the constitutional amendment.[138] Starting with the Preemption Bill was consistent with the approach of the national movement, of which DSSA was a part. The NRA was concerned that the success they achieved at the state level could be undone if local governments, including those of major cities whose citizens may be more supportive of gun regulation, could enact citywide regulations restricting gun possession and use. And the reality of our constitutional amendment process was also a consideration. As is well-known, to adopt an amendment to our Constitution by action of our General Assembly, each chamber of two successive General Assemblies must pass the amendment by a two-thirds vote.[139] Thus, even after the first leg of an amendment is adopted, the amendment is not effective until the second leg is adopted by the next General Assembly.[140] The Preemption Bill reads in a way that underscores it is about jurisdiction-wide regulation of ownership and possession: [Municipalities and counties cannot] prohibit, restrict or license, ownership, transfer, possession or transportation of firearms or components of firearms or ammunition, except that the discharge of a firearm may be regulated; provided that any regulation or ordinance incorporates the justification defenses as found in Title 11 of the Delaware Code.... "Nothing contained herein shall be construed to invalidate existing municipal ordinances.[141] ’ The language' of the Preemption Bill makes sense in light of what gun advocates were concerned about, which was not restricting the ability of local governments to prohibit the possession and use of firearms' on their own land. It was about the NRA’s national goal to confine regulation of possession and-use of firearms to state legislatures, where the NRA had been successful, and to avoid having that success undermined by local jurisdictions enacting jurisdiction-wide regulation of gun possession and use.[142] But, there was a key aspect of the Preemption Bill that was important in the consideration of both it, and in the next year, Section 20: the concession by the advocates of the bill and Section 20 that confirmed the bill would not “be construed to invalidate existing municipal ordinances.” [143] Despite the compromise struck in 1985, a member of the Wilmington City Council attempted to circumvent the General Assembly’s intent by identifying what she thought was a loophole in the original Preemption Bill. The City Council member felt that she could bypass the Preemption Bill by acting by city ordinance, rather than a charter change, and proposed an ordinance that would have outlawed the public display of dangerous weapons in Wilmington (i.e,, “open carry”).[144] .The General Assembly acted to close any arguable gap in the original Preemption Bill, by adopting a supplemental bill, making it plain that it did not matter how a municipality tried to regulate gun possession and use. Together, the two Preemption Bills preempted municipal firearm regulation by law, regulation, or ordinance postdating the approval of the original Preemption Bill, and thereby achieved the original Preemption Bill’s intended effect.[145] [[Image here]] Absent from the Preemption Bills’ text and any statement of its' supporters was that the bill had any effect on the ability of any local government, including the county governments, to prohibit the possession and use of firearms on their own property. As we have discussed, in 1981, Kent County enacted an ordinance prohibiting gun possession within its county parks. No proponent of the Preemption Bills, in 1985 or 1986 argued that its text ■ operated to preempt that ordinance, and no one filed suit alleging that Kent County’s ordinance violated the Preemption Bills. One would expect that, if the Preemption Bills were intended to preempt existing county regulation on firearm use and possession on government property, Kent County’s ordinance would have been discussed, or at least challenged after the bill passed. B. ■ It was against this the backdrop that the first leg was considered in July 1986. The purpose of the first leg was to “explicitly protect[] the traditional lawful right to keep and bear arms.”[146] Section 20 was thus written in a way that made clear that the rights it secured were personal and not confined to protecting the types of gun ownership necessary to participation in a militia. The text of Section 20 states: A person has the right to keep and bear arms for .the defense of self, family, home and state, and for hunting and recreational use.[147] Consistent with earlier assurances that Section 20 was not designed to unsettle existing municipal regulations, the General Assembly’s consideration of Section 20 provides no evidence' that it intended to undermine the state’s traditional recognition of the right of property owners to exclude firearms from their property. To the contrary, General Assembly members at the first House debate addressing Section 20 confirmed that it “doesn’t give everyone carte blanche to carry a weapon,” [148] but instead, “continues to give the state the right to regulate ... things not within the realm of sportsmen, and hunters.” [149] There is also no evidence that the General Assembly intended for Section 20 to cover more ground than the Second Amendment; instead, the proponents of Section 20 just wanted to make clear that the right to bear arms to which Section 20 referred was not conditioned on any connection to.raising a militia. In the debates on Section 20’s first .leg, one Representative explained that Section 20 would incorporate the Second Amendment to the State of Delaware and provide “the same rights we have under the Second Amendment to the United States Constitution .... That’s all the bill does, there’s nothing added, nothing detracted, that I know of, that we don’t already have in the United States Constitution’s Second Amendment.” [150] After this statement, the House called roll and passed the bill approving Section 20, which the Senate then passed without debate. The Senate debate on Section 20’s second leg in 1987 reflects the same understanding documented in the first leg, with the Senators confirming that Section 20 was intended to address the longstanding fact that the Second Amendment only restricted federal, not state, action and did not protect a right to bear arms unconnected to raising a militia.[151] John Thompson, President of the DSSA, testified that Delaware needed this Amendment because the Second Amendment did not apply to the states under the “Doctrine of Selective Incorporation.”[152] The DSSA was concerned about a recent Seventh Circuit case that held the “possession of handguns by individuals is not part of the right to keep and bear arms.”[153] The NRA encouraged its Delaware members to advocate for the passage of Section 20: The National Rifle Association is advising its members in Delaware to contact their state senators and urge passage of an amendment to the state constitution providing for the “right to keep and bear arms.” In a letter dated April 9, the' NRA’s Institute for Legislative Action says that passage of H.B. 30 “will prevent the banning and/or confiscation of firearms from law-abiding citizens of Delaware. ” The organization says a number of courts have ruled that the Second Amendment to the U.S. Constitution is not binding on the states.[154] Thus, according to testimony at the debate, Delaware needed Section 20 to “protect the rights of individuals.”[155] Senator Holloway stated: “What I read in the Bill, I read in the Constitution of the United States—that the right to keep and bear firearms shall not be infringed upon.”[156] Both the DSSA and Senators acknowledged that the legislation was preemptive, intending to prevent future regulations from infringing on individuals’ right to bear arms.[157] As Senator Neal explained, “the whole purpose of this [Amendment] ... was not based on anything that’s happened in Delaware, but based on judicial cases in other states that have said that the federal provision does not apply.”[158] This was reiterated by Senator Adams, who clarified that Section 20 would “not change [legislation banning automatic firearms] in any way.”'[159] The NRA and its Delaware affiliate was focused on preventing “the banning and/or confiscation of firearms”[160] not on limiting the ability of property owners, and the government, to regulate possession and use of firearms on their own land. The Senate approved Section 20, and the House then passed it without debate, thereby completing the second leg of the process, and Section 20 took effect on April 16,1987.[161] [[Image here]] Lacking from the text of Section 20, its legislative history, or our Second Amendment jurisprudence is any suggestion that Section 20 limited the ability of our state government to restrict the possession and use of firearms on.its own property. Much less did anyone intend that Section 20 or the Preemption Bills would open our Parks and Forests, and those of Kent County, to weapons possession and use. Had they argued that Section 20 was a silent destroyer of the government’s ability to continue longstanding policies regulating use of its own land, the need for .the proponents tp grandfather existing municipal regulations and to make assurances to members of the General Assembly about the limited purpose of Section 20 suggests that , they would likely have not succeeded in securing the necessary votes. VII. In the wake of its adoption, no proponent of Section 20 sought to challenge the Regulations. That is telling because the NRA,' one of - the appellants’ friends in amicus, was the driving force behind Section 20, as our explanation of the legisla-five history shows.[162] Yet, after Section 20 was passed, the NRA at ho time sought to sue and argue that it invalidated the Regulations. Nor did its local affiliate, the DSSA, despite being quite active in the legislative process, procure even the introduction of a bill proposing to overturn the Regulations.[163] Consistent with-the General Assembly’s confirmed purpose in adopting Section 20, we find no seismic shift in Delaware’s regulation of firearms. Rather, in the years following the adoption of Section 20,- the state’s regulation of firearms was true to its historical approach. A. Delaware continued to restrict concealed carry of deadly Weapons. In fact, in 1989, the General Assembly re-codified Dela-ware’s concealed carry licensing statute as it was written, but provided that “no requirements in addition to those specified in this paragraph may be imposed for the renewal of a license.”[164] And Delaware courts held that the limited nature of the concealed carry permit did not change in light of the adoption of Section 20, noting that Delaware’s concealed carry statute is “supported by a legitimate State interest.”[165] In considering whether the conditions attached to a concealed carry license abridge a “fundamental” constitutional right, the Superior Court noted: “A license to carry a concealed deadly weapon is not one of the ‘fundamental’ rights guaranteed by the federal constitution, the state constitution, or .by the courts.”[166] The Superior Court applied a rational basis test to the challenge to the conditions placed on a concealed carry permit, reasoning “no ‘fundamental’ right to bear arms exists and a restriction or condition on a license to carry a concealed deadly weapon may be imposed. without violating the Applicant’s right to substantive due process.”[167] And in 2005, this Court reiterated that the defendant had the burden of proving possession of a concealed carry license and noted that Delaware’s concealed carry statute predated Section 20 and was unchanged by it.[168] . The State also continued to restrict firearm possession and use in other ways. For example, in 1990, the General Assembly directed educational institutions with on-campus housing to develop regulations “governing the possession and use of firearms on campus by employees, students, and visitors.”[169] In' 1991, this Court affirmed the constitutionality of the General Assembly’s prohibition on firearm possession by convicted felons.[170] In 1994, the General Assembly made it unlawful to allow a minor access to a firearm.[171] A year later, it-recognized the crime of aggravated menacing, when a person “display[s] what appears to be a deadly weapon [and] intentionally places another person in fear of imminent physical injury.”[172] And Delaware,[173] and the United States,[174] continued to recognize the rights of property owners—including the government [175]—to exclude others from their land. B. The common and accepted understanding that neither Section 20 nor the Preemption Bills-were meant to infringe on the government’s right to- restrict the possession and use of firearms on its own land was further confirmed in 1998, when our largest county, New Castle County, prohibited the possession or discharge of firearms in its,parks: - No person shall, carry a knife upon his or her person having a blade three (3) inches or longer in length or have possession of or discharge a BB gun, air rifle, pistol, firearm, paint ball gun, bow and arrow or any other -type of lethal weapon in any park.[176] New Castle County’s parks offer many of the same activities as our Parks,[177] including educational and other activities for children,[178] and host sporting events,[179] at which spirits often run high and tempers can flare. The New Castle County parks also host annual events, such as Carousel Park’s overnight family camping event, Sleep Under the Stars, which, since May 2000,[180] has attracted thousands of residents to New Castle County parks for a night of activities such as hayrides, a dance party, art activities with the Dela-ware Children’s Museum, a tent decorating contest, and movie screening.[181] The New Castle County ordinance was never challenged under either Section 20 or the Preemption Bills, or by a bill in the General Assembly to overturn it. To this day, the prohibition on possession of firearms in parks is still in the New Castle County Code,[182] included in trail guides available to the public,[183] and posted on event-specific registration websites park visitors use to sign up for certain events.[184] And Kent County’s parallel ban dating from 1981 remains in effect.[185] That these county ordinances are in full force suggests that the Preemption Bills were neither intended nor understood to disturb county-level regulation of firearm possession and use on county property.[186] VIII. Against this backdrop of continued firearm regulation, unchanged by the adoption of Section 20, the Supreme Court of the United States in 2008 and 2010 decided the two cases that began the appellants’ process of discovering what Section 20 meant and impelled this facial challenge: District of Columbia v. Heller and McDonald v. City of Chicago,[187] Heller and McDonald addressed the issues that inspired Dela-ware’s and other states’ adoption of a state constitutional right to bear arms: that the Second Amendment had been long held: i) not to apply to the states; and ii) not to protect an individual right to bear arms outside the collective right to raise a militia. A. At issue in Heller was a series of ordinances passed by the District of Columbia that the Supreme Court Majority found amounted to a “total ban” on the possession of handguns anywhere within the city including in private residences, and on the possession of other operable firearms within the home.[188] The challenged ordinances were held to be a total ban because they: i) criminalized the carrying of an unregistered firearm; ii) prohibited the registration of a handgun; iii) prohibited the carrying of a handgun without a one-year license issued by the chief of police;. and iv) required that firearms other than handguns that could have been lawfully pos- sessed within the District of Columbia be unloaded and dissembled or bound by a trigger lock, unless located in a place of business or used for recreational activities.[189] Under these ordinances, the respondent, Dick Heller, a special police officer authorized to carry a handgun while on duty at a judiciary building, was not granted a registration certificate for a handgun he wanted to keep at home.[190] The five-to-four Majority, addressing the constitutionality of this citywide ban on handguns, resolved the issue of whether the Second Amendment guaranteed an individual right to bear arms in the manner sought by gun advocates, stating: “There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms.”[191] In doing so, it took a position different than several prior Supreme Court decisions,[192] and many Federal Court of Appeals decisions.[193] The Supreme Court Majority, basing its reasoning on separate analyses of the text of the Second Amendment’s operative and prefatory clauses in their historical context, also held that “the District’s ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense.”[194] The Supreme Court Majority acknowledged that the Second Amendment’s prefatory clause identifies preservation of the militia as ,a purpose of the right to bear arms, but relying on its own appreciation of popular sentiment in the late .eighteenth century, found that this is just one reason that the right to bear arms was valued and that, “most [Americans in 1789] undoubtedly thought it even more important for self-defense and hunting.”[195] Because the District of Columbia ordinances at issue applied to handguns, the type of weapon “overwhelmingly chosen by American society for [the] lawful purpose” of self-defense, and because the ordinances extended “to the home, where the need for defense of self, family,- and property is most acute,” the Supreme Court found the ordinances to be unconstitutional,[196] In so doing, Heller cautioned that: [N]othing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by-felons and the -mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions-and qualifications on the commercial sale of arms.[197] Two years later, the Supreme Court, addressing the other issue that motivated Section 20, reversed the venerable Supreme Court authority holding that the Second Amendment did not restrict action by states, but only by the federal government.[198] In McDonald v. City of Chicago, the Supreme Court evaluated the constitutionality of, a Chicago city ordinance that prohibited possession of an unregistered handgun and prohibited “registration of most handguns, thus effectively banning handgun possession by almost all private • citizens who reside in the City,”[199] and an Oak Park ordinance that made, it unlawful to possess any firearm, including handguns.[200] The Supreme Court relied on its conclusion in Heller that “citizens must be permitted ‘to use [handguns] for the core lawful purpose of self-defense,’”[201] and held that the Second Amendment is applicable to the states, finding it “clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty.” [202] The Court then invalidated the ordinances as unconstitutional. But as McDonald reaffirmed, Heller. [D]id not cast doubt on such longstanding regulatory measures as “prohibitions on the.possession of firearms by felons and’ the mentally ill,” “laws forbidding the carrying of firearms in sensitive' places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.” [203] Even after these decisions, no. bill was introduced in the General Assembly to overturn the Regulations, and no lawsuit was filed challenging the Regulations’ constitutionality under the Second Amendment or Section 20.[204] IX. Following yet another period of silence, in-which no constitutional challenges to the Regulations were brought after the Supreme Court’s decisions in Heller and McDonald, this Court reviewed in' 2014 the constitutionality of certain public housing leases under Section 20 of the Delaware Constitution in answering certified questions posed by the United States Court of Appeals for the Third Circuit.[205] It would take Doe to ignite the Edison switch of the DSSA and its allies and for them to light on the idea that the' forty-year-old Park Regulation and the fourteen-year-old Forest Regulation violated Section 20. A. The challenged provisions in Doe prohibited residents of a housing complex managed by the Wilmington Housing Authority and their guests from displaying or carrying a firearm in the common areas of their apartment complex, unless they were transporting the firearm to or from their unit or using it in self-defense, and required residents to produce documents showing they could legally own or possess the firearm when there was reasonable cause to believe the provisions had been violated.[206] The provisions applied to “ ‘various community spaces such as daycare facilities, libraries, and community rooms,’ as well as laundry rooms and administrative offices.” [207] The common areas also included the rooms that offered residents use of a computer, used by children when doing their homework, and television rooms.[208] Violation of the provisions would result in immediate termination of the resident’s lease and eviction.[209] Two residents of WHA-managed apartment complexes brought suit alleging that the lease provisions infringed on their right to keep and bear arms in common areas they used in the same way as parts of their private residences.[210] The District Court considered the constitutionality of the lease provisions under both the Second Amendment and Section 20.[211] Observing that “[n]othing in the language of the De-laware constitutional provision speaks directly to the possession of firearms in common areas of public housing facilities,” the District Court, following federal precedent requiring that it predict the decision of a state’s highest court where that court has not yet addressed the critical issue in the case before it, conducted no independent analysis of Section 2Ó.[212] The District Court, noting that the lease provisions do “not severely limit those [Second Amendment] rights inside the home—or come close to the level of infringement struck down in Heller,”[213] analyzed the lease provisions under intermediate scrutiny. The District Court found that because “WHA, as a state agency, has an important and substantial interest in protecting the health, safety, and welfare of its residents, their guests, its employees, and the public at large while on WHA property,” the lease provisions furthered a substantial government interest in public safety by limiting opportunities for violence in places where children and the elderly made up a large proportion of the people using the common areas.[214] Holding that the lease provisions did not “constitute a complete ban on use of firearms for self-defense in the common areas,” the District Court determined that the lease provisions did not burden any Second Amendment right any more than reasonably necessary to achieve the government objective, and therefore, were constitutional under the Second Amendment.[215] The District Court also held that the challenged provisions were constitutional under Section 20 based on its “prediction] that, if faced with the instant dispute, the Delaware Supreme Court, in interpreting the Delaware Constitution, would look to Heller, McDonald, Marzzarella [a Third Circuit case holding that a federal law prohibiting possession of a firearm with an obliterated serial number survives intermediate scrutiny], and other authority from the U.S. Supreme Court and Third Circuit construing the Second Amendment.” [216] The residents appealed the District Court’s decision that the lease provisions are constitutional under Section 20, but did not appeal its decision on the constitutionality of the lease provisions under the Second Amendment.[217] The Third Circuit, recognizing that the appeal raised unresolved state constitutional law questions, requested that this Court answer two questions related to the constitutionality of the lease provisions under Section 20: whether firearm possession and display could be limited in the common areas of the apartment complex, and whether WHA could require residents and their guests to produce documentation related to firearm ownership or transportation upon request when there was reasonable cause to believe the provisions had been violated.[218] This Court, presented with these certified questions, used the fledgling federal approach of Heller and McDonald to answer these certified questions under state law. That is, although Doe posed questions of our state’s law, the Doe Court let Heller and McDonald shape the lens it used to examine if the lease provisions violated Section 20. After doing so, the Doe Court found the provisions to be unconstitutionally overbroad because of their burden on the residents’ right to “keep and bear arms for the defense of self, family, and home.”[219] Noting that the “[Residents have a possessory interest in both their apartments and the common areas,” [220] this Court observed that “[w]ith the Common Area Provision in force under penalty of eviction, reasonable law-abiding adults become disarmed and unable to repel an intruder by force in any common living areas when the intervention of society on their behalf may be too late to prevent an injury.”[221] “[T]he Common Area Provision severely burdens the right by functionally disallowing armed self-defense in areas that Residents, their families, and guests may occupy as part of their living space.” [222] This Court “decline[d] to determine whether Second Amendment rights extend outside the home,” [223] but noted that Section 20 “is intentionally broader than the Second Amendment and protects the right to bear arms outside the home, including for hunting and recreation. Section 20 specifically provides for the defense of self and. family, in addition to the home.”[224] The Majority gives Doe an expansive reading that slights the precise nature of the certified questions of law presented to this Court by a federal appellate court.[225] To us, Doe is best rationalized as affording to residents of public housing the right to bear arms-in,areas of their own apartment complex that, as a matter of day-torday living, the Doe Court felt the residents had to use for-quotidian activities like laundry. Doe can be seen as holding that our state government cannot, through an agency that “essentially replicates for low-income families services similar to those provided by a private landlord,” [226] deny to low income residents the right to bear arms in their residences and attached common areas in which they, as residents, have a “possessory interest” [227] and a need to use them for core residential functions. By its own terms, Doe made plain that the Wilmington Housing Authority was not providing services like those provided on government property. Rather, Doe focused on whether the state constitutional right extended to the common areas because they are an extension of the residents’ homes. As Doe stated: ■ The common areas are effectively part of the residences. The laundry rooms and TV rooms are similar to those typically found in private residences; and the Residents, their families, and their guests will occupy them as part of their living space.[228] We do not read Doe as at all addressing the question of the government’s right to act as a proprietor when it is not renting homes to others, or to regulate firearm -use and possession on its own property when it is in full control of its - own «possessory rights. In fact, Doe itself noted that “the right to bear arms under the Delaware Declaration of Rights ... is not absolute.”[229] For these reasons, Doe is best rationalized, in our view, a,s embracing heightened scrutiny out of a concern that the government should not, as a landlord, deny poor renters the same ability to carry guns as those who pwn homes. And to the extent that Doe is interpreted to say more than necessary to answer the precise question before it, we disagree with it. - Although we are not asked to consider if Doe was correct, we view the cursory consideration Doe gave to the realities of apartment life, as well as Doe’s failure to consider its implications for owners of private apartment complex.es, to be problematic. To wit, Doe failed to give any weight to the interests of residents using shared spaces with other families in having those spaces be free of weapons. Those residents have children, and may want their children and themselves to be in spaces free from deadly weapons. Doe’s failure to give weight to the reality that residents’ children did homework in the common areas exemplifies this.[230] Doe also gave little weight to the nuanced determination of the WHA’s provisions, which allowed its renters to carry their firearms to and from their residences, and keep them there. As concerning, Doe's reasoning, if accepted on its face, would suggest that owners of private apartment and condominium complexes could not limit weapon possession and use on their own private property. For present purposes, we content ourselves with noting that this Court’s, answer to the certified question in Doe did not require it to consider whether Section 20 involved a silent determination that our government cannot set the rules of access for entry to its own land, when it is not acting as a landlord. The absence of any careful consideration of the .legislative history of Section 20 or prior Delaware history in Doe underscores the residential-focused nature of that case. In fact, Heller noted that “the need for defense of self, family, and property is most acute” in the home.[231] Doe echoed that sentiment,[232] And Heller and McDonald dealt with jurisdiction-wide prohibitions on possession and use of firearms, even within privaté residences. They in no manner imply a right to possession and use of guns on,someone else’s property. The provisions at issue in Doe applied.to extensions of the residents’ homes: laundry, television, and computer areas. But, here, the Regulations do not prohibit the appellants from possessing or using firearms in their homes, or even- in extensions of them. And, as to Parks and Forests, our government is the owner and full' steward, not a landlord. And we do not believe that the phrase “self, family, home and State” in Section 20 can be reasonably read as referring to separate independent concepts.[233] Rather, they should be understood as expressing the collective idea that the most important interests associated with life may be defended by a weapon.-For example, we doubt that the reference to “home” means that. a home may be protected by any weapon of any kind. We know,-for example, that no one contends that Section 20 should’, ¿e, réad in a literal way to permit a homeowner to shoot a bullet at an adolescent who eggs his house on mischief night or throws a snowball at it on a winter’s day. i It is illegal in Delaware to defend property with lethal force without the justification that’ it was necessary in self-defense.[234] We also do not think the use of ■the-words “self’ and “family” can be read to create a license to bear arms anywhere in Delaware. Rather, they are more logically read in a way connected to the concept gun advocates have embraced of home as a safe, personal, and family “castle.”[235] Of the two states with provisions nearly identical to Delaware’s,[236] seven states with similar provisions in that they provide for defense of the home,[237] and three states that provide for defense of “property,” without referencing the home,[238] none have found that their provision is “intentionally broader” than the Second Amendment because it “provides for the defense of self and family in addition to the home.”[239] [[Image here]] We also underscore another reality: nothing in Section 20 can be read as allowing anyone to trample another’s property rights by armed trespass. After this Court’s decision in Doe, Delaware enacted legislation to loosen registration and licensing requirements for retired police officers to obtain and carry concealed weapons.[240] Delaware also enacted Sections 1441A and 1441B, which adopted portions of the Federal Law Enforcement Officers Safety Act.[241] Both the Federal and Dela-ware provisions state that the special firearm rules for retired officers do not “supersede or limit the laws of any state that ... (1) Permit private persons or entities to prohibit or restrict the possession of concealed firearms on their property; or (2) Prohibit or restrict the possession of firearms on any state or local government property, installation, building, base, or park.”[242] In 2016, the General Assembly also reclassified the penalties associated with a violation of the Regulations, implicitly ratifying the Regulations.[243] That is, even after the General Assembly reviewed the Regulations and codified the new penalties for violations thereof, the General Assembly did not consider the Regulations to infringe on any right protected by Section 20, but rather, to be a valid exercise of its power to regulate its own land. X. Discovering by way of Heller, McDonald, and Doe that the longstanding Regulations violated Section 20, the appellants brought this suit in 2015.[244] In attacking the Regulations; the appellants make a simple contention: that they are inhibited from enjoying the Parks and Forests because they cannot carry deadly weapons in them for personal protection.[245] They do not argue that they need the weapons for lawful hunting, as they admit that lawful hunting is permitted.[246] Rather, they say, for example, that they would rent a cabin in a Park for their family but do not do so because they will not be able to use deadly force to protect their rented “home” [247] or that they would go surf fishing if they could take a gun for personal protection.[248] That is, the appellants argue that the problem with the Regulations is that the State, as proprietor of its own land, infringes their rights under Section 20 by not allowing firearm possession in the Parks and Forests,'except for lawful hunting or with special permission.[249] In arguing that the State may not restrict use of its Parks and Forests to those who agree not to bear arms in compliance with the Regulations, the appellants rely on Doe’s tight embrace of Heller and McDonald as a gloss on our State Constitution’s meaning.[250] The appellants stress Doe’s suggestion that Section 20 is even broader than the expanded, sweeping reach of the eighteenth century Second Amendment first recognized in those twen-' ty-first century decisions. Having discovered by way of these cases, that the forty-year-old Park Regulation and the fourteen-year-old Forest Regulation, as amended to match the Park Regulation in 2003, now impinge on the thirty-year-old Section 20, the appellants raise a facial challenge, contending that the right to bear arms extends well beyond the home to the right to do so in. our state-owned Parks and Forests.[251] A. ’ Before we examine the appellants’ claims, we pause tb highlight the purpose and function of our Parks and Forests: providing a haven for recreation, education, family-oriented activities, and athletics. , As was the' case in 1977, Delaware’s Parks and Forests remain places where families gather for picnics, camping, and Girl and Boy Scout activities.[252] Our Parks arid Forests support our schools by hosting field trips and providing kids with experiences in nature that they may otherwise not have.[253] Summer camps in the Parks and Forests offer adult supervision during parents’ working hours and continued education outside of the school year.[254] Our Parks and Forests serve as the home field for school sporting events, cross-country meets, lacrosse games, rugby matches, and other sports,[255] as well as a venue for corporate events and weddings.[256] And, of course, the Parks and Forests are used for outdoor activities like hiking, fishing, binding, and camping.[257] These activities are not done in isolation, one user at a time. Our Parks and Forests are shared spaces that host thousands of visitors each year.[258] Our Parks and Forests are places where Delawareans can seek refuge from the hurly-burly of daily life and enjoy the beauty of nature. These are not places to which people can demand exclusive access, but instead, places people must share in a way consistent with everyone’s safe enjoyment and in compliance with the rules of access, behavior, and use set by those selected by our Governor and confirmed by our Senate to operate them. The property to which the Regulations apply is state property. B. Turning now to the appellants’ claims, we .first note that the appellants ;did not challenge an application,of the Regulations to any specific situation, mount a precise challenge to the Regulations, or argue that the Regulations are. overbroad in some particular respect. Instead, the appellants chose to make a facial challenge.[259] Federal courts considering a facial challenge to an agency regulation, aware they “are [not] a legislature charged with formulating public policy,” [260] require that the challenger “establish that no set of circumstances exists under which the [regulation] would be valid.” [261] Our law is identical.[262] This position of deference to those charged with setting public policy is reflected in our jurisprudence and the governing statute of Delaware’s APA, which together establish the standard under which this Court must consider the appellants’ sweeping attacks on the validity of longstanding government regulations. Under generations of Delaware decisional law, when a stark claim like that of the appellants’ is made, this Court exercises judicial restraint, with “a strong presumption of constitutionality attending a legislative enactment which, unless the evidence of unconstitutionality is clear and convincing, the court will be reluctant to ignore.” [263] This presumption applies to challenges to statutes and agency regulations promulgated under delegated authority, which have the force and effect of law,[264] is codified in the Delaware’s APA, which provides: [T]he agency action shall be presumed to be valid and the complaining party shall have the burden of proving either that the action was taken in a substantially unlawful manner and the complainant suffered prejudice thereby, or that the regulation, where required, was adopted without a reasonable basis on the record or is otherwise unlawful.[265] When a challenge is made to a longstanding regulatory policy, the presumption is given even more weight.[266] The General Assembly “is presumed to be aware of existing law.” [267] This Court recognizes that “[extended legislative inaction following executive practice is indicative of legislative intent and, relatedly, longstanding executive construction of a ‘doubtful’ statute is given weight.” [268] The General Assembly’s non-interference with a longstanding agency regulation is the sort of legislative inaction this Court recognizes as indicative of legislative intent.[269] Under these principles, the appellants must therefore overcome the strong presumption that the Regulations are valid, and any doubts must be resolved against the appellants on this facial challenge.[270] This procedural posture is important to a fair resolution. As we have noted, the Regulations were not challenged under the APA when promulgated. At the time the Regulations were adopted, there was no reason to believe they were controversial under existing Delaware or federal law, and the Regulations were anticipated by generations of similar city, state, and federal policies. The traditional deferential standard of review with which we are required to approach this case is a reminder of the care that ought to be taken when we are tempted to discover that a longstanding practice supported and implemented by generations of Delaware governors and cabinet secretaries of both parties, and never thé subject of legislative controversy,' has, from its inception, been unconstitutional.[271] W^ith these principles of judicial restraint in mind, we next explain why the Regulations do not intrude on any conduct protected by Section 20: because Section 20 does not grant anyone a right to possess or use a weapon on someone else’s property, that of the State. We then explain why, even if the Regulations do rege-late conduct protected by Section 20, they are not subject to intermediate scrutiny' because they are regulations of gun possession and use in sensitive places, and even if intermediate scrutiny did apply, they pass constitutional muster. C. We would reject the appellants’ claims for a simple reason. The Parks and Forests are not the commons; they are places that are restricted in access in many ways, and only account for three percent of the state’s acreage.[272] As we have shown, nothing in the text or history of Section 20 supports the idea that it limits the General Assembly’s ability to restrict the possession and use of firearms on-its own property.[273] To the contrary, both the text and its understood meaning support the constitutional validity of the Regulations. D. The Regulations apply to places our society has long recognized as sensitive places where the possession and use of firearms is contrary to settled .public policy objectives. In Doe, this Court noted that, “where the government is a proprietor or employer, it has a legitimate interest in- controlling unsafe or disruptive be-havioi; on its property.... [Occupying the status of government landlord, alone and without more, does not control. How the property is used must also be considered.”[274] As we have shown, the stater owned land at issue here is sensitive because of its regular and shared use by families, children, and adults for education, leisure, and recreation. Operating as a proprietor of the Parks and Forests, the Agencies control unsafe behavior in these sensitive areas by restricting firearm possession and use. The demonstrated practice of generations of federal, state, and local policymakers to regulate gun possession and use in Parks and natural areas - like the Forests underscores that they are sensitive places within the meaning of Heller and McDonald, which purport to rely on societal understandings. When a durable, bipartisan consensus judgment has existed for generations that these are sensitive places, the principles of judicial restraint that bind us on this facial challenge instruct us to respect that decision, not to supplant it with a judicial substitute. ’ Although Heller does not require regulation of sensitive places to be longstanding to be lawful,[275] history shows that the Regulations are of a type that is longstanding. The Regulations: i) predate the adoption of Section 20; ii) are rooted in Delaware policies dating back to 1887 and are in accord with Park policies dating back to at least 1962 and the Kent County ordinance adopted in 1981; iii) are consistent with the federal policy adopted in 1938 prohibiting' possession and use in the national parks; iv) have been amended, subject to public notice and comment without constitutional challenge, even after 1987; v) have been observed by Park and Forest visitors and employees since their adoption; vi) were referenced in legislation addressing concealed carry by law enforcement officers in 2015 and were an exception to the legislative scope; and vii) have had their penalties for violation reviewed and amended by the General Assembly as recently as 2016.[276] E.. But even if the Regulations were subject to heightened scrutiny, they pass constitutional muster. Second Amendment challenges under intermediate" scrutiny require the government to show that the regulation: i) serves an important governmental interest; ii) is substantially related to that interest; and iii) does not burden the right more than reasonably necessary.[277] The Agencies haye an important interest in promoting public safety within their Parks, and Forests. The General Assembly has authorized DNREC and DOA to maintain and administer Parks and Forests for the enjoyment of the public.[278] And the Regulations further-the Agencies’ public safety objective by allowing visitors to enjoy the activities offered in Parks and Forests without fear of injury from firearms or intimidation by their presence.[279] And the Agencies further that interest through the Regulations, which are not a “total ban,” [280] but rather, apply to just three percent of our state’s acreage.[281] Unlike the ordinances at issue in Heller and McDonald that applied to the entire polity, the. Regulations are far more limited in their geographic scope.[282] And even within the Parks and Forests, the Regulations are not a “total ban” because they allow firearms for legal hunting, and with written permission in the Parks and administrative waiver in the Forests.[283] If the Majority’s characterization of the Regulations as a “total ban” is correct, restrictions on firearms in schools, courthouses, and other public spaces would each also be a “total ban,” because they too delineate a limited geographic space in which firearm possession and use is regulated. The appellants argue that the Agencies’ failure to demonstrate that the Regulations further public safety results in the .Regulations’ failure to satisfy intermediate scrutiny.[284] And it is true that Doe required the government to establish more than a “general safety concern” to pass intermediate scrutiny.[285] But Doe addressed firearms inside the home and explained that “[i]n this context, [Defendants] must show more than a general safety concern.” [286] This is consistent with the Supreme Court’s understanding in McDonald and Heller that “the need for defense of self, family, and property is most acute in the home.” [287] Courts addressing firearm prohibitions outside the home have found that general safety concerns qualify as important governmental interests.[288] Despite this contention and the appellants’ facial challenge, they and their friends in amicus debate the effect of gun control on public safety. Their briefs conjure up visions that, for generations, Dela-ware Park users and Forest walkers have been subject to violent attacks by criminals and wild animals, citing in support of this contention the vast expanse of Park land, the fact that Delaware only has twenty-one park rangers to cover that land, and the existence of threatening wild animal species in the Parks and Forests.[289] The appellants contend that the correlation between firearms regulation and violence is inconclusive, and further, that “[t]he Legislature has not found possession and carrying of firearms in a majority of the public space throughout the State to be a risk to public safety.” [290] But their inability to accompany with data their vivid descriptions of why deadly weapons might be needed by a Park or Forest visitor'suggests that, in comparison to other places in Delaware where it would be easy to find many examples of gun violence, our Parks and Forests are safer. This is too thin a gruel to provide a basis for overturning the judgment of generations of officials charged with operating our Parks and acting as stewards of our Forests that they should be weapons-free, with limited exceptions. The appellants’ inability to make this showing is important given our duty to exercise restraint and to accord the benefit of the doubt to those entrusted with operating our Parks and Forests in the public interest. Their judgment that limiting the possession and use of firearms within P.arks and Forests best facilitates the safe enjoyment of these special places as havens for education, family time, recreation, athletics, and outdoor activities should not be lightly upset, even if there was data that could create a reason for debate. Because the appellants and their friends in amicus fail to provide any support for the proposition that the Regulations have failed in their intended and compelling public purpose, this Court’s precedent requires that we stay our hand and defer to those entrusted with the responsibility to run our Parks and Forests. Of course, the Majority faults the Agencies for failing in 1977 to anticipate federal decisions issued in 2008 and 2010 and apply them to the Regulations.[291] But it cannot be that our Executive Branch officials are expected to live out of chronological time and to factor into their decisions federal judicial decisions that post-date their actions by nearly thirty years. In many religious traditions, only the Creator is seen as existing out of ordinary time, and humans are seen as having more mundane abilities. Nostradamus made many predictions, but among them were not the Heller and McDonald decisions, nor the decision in Doe. ..It also comes with some chutzpah for the Judiciary, which works in a place where firearm possession is denied to.all but security staff, to demand that generations of seasoned administrators parade social science research supporting their common sense determination that our Parks and Forests will be safer if they are as free as possible from the presence of deadly force.[292] Deferring to the legislative' judgment that the Regulations further the important governmental objective of public safety and acknowledging the Regulations’ provision for exceptions, we would find that the Regulations do not burden the right to bear arms any more than necessary. The Regulations limit firearm possession and use in specific areas on government property the public is invited to enjoy in a shared.way, where children are encouraged to be present, and for purposes that may cause emotions and spirits to run too high at times. A core purpose of Section 20, to allow use of guns for hunting, is facilitated by the Parks and Forests. Dela-ware’s Parks and Forests account for three percent of the state’s total acreage, and the activities available in Parks and Forests can be enjoyed in places other than on state property.[293] And the Regulations provide for exception or waiver.[294] That the Park and Forest Regulations do not burden conduct protected under Section 20 any more than reasonably necessary, if at all, is underscored by the reality of what Parks and Forests are. They do not consist of separate, locked, walled enclosures, where firearm possession and use can be cabined and confined. They are open places, without natural barriers to trap bullets or flying arrows, or to restrict where guns .can be possessed and used. Setting aside the Regulations on the speculation that there are safe, practicable, and inexpensive ways to open our Parks and Forests to discrete possession- and use of weapons turns the ‘requirement that we give deference to the Agencies in this context upside down.[295] Invalidating the Regulations will also make it more difficult for Park and Forest officials to police hunting by use of improper weapons, as they will confront claims that the people they suspect were hunting were instead carrying the weapon for purposes of self-defense. And should the Parks and Forests have to have kid-free, education-free, sporting games-free, beer-free, or camping-free days in the Parks and Forests, when those who wish to carry weapons can have the Parks and Forests to themselves, without presenting a danger to those who wish to enjoy these core Park and Forest activities? [296] Conjuring up a sensible, less-restrictive policy is not our function, and the appellants did not choose to make a focused challenge. They made a broad, ' facial challenge and have not come close to undermining the reasonableness of the longstanding policy judgment in the Regulations, the same one that characterized the national policy in 1987, when Section 20 was adopted. Consistent with our reasoning, federal courts have found that prohibiting firearms on government property to ensure visitor safety advances an important policy objective and survives intermediate scrutiny.[297]' XI. Our tradition is to be restrained in overturning the settled determination of our Executive and Legislative Branches about important policy issues entrusted to them. For generations, a bipartisan array of governors and their duly confirmed cabinet secretaries has deemed it best for Delawareans that their Parks and Forests be places where the possession and úse of deadly weapons is regulated. When Section 20 was adopted, no one in the General Assembly or the Executive Branch believed it upset these policies, and nor did anyone for the thirty years that followed. We regret that the authority to regulate our Parks and Forests has now been wrested from the control of the governors our citizens elect based on importing novel principles of federal constitutional law favored by gun rights advocates into a Dela-ware Constitution that does not embody them. The appellants have failed to show that the Regulations do not advance the important objective of making our Parks and Forests safe, shared havens for the education, enjoyment, relaxation, and recreation of Delaware families, children, and adults. The outcome here does not solve a problem, it creates one, and puts our Executive Branch in the unnecessary predicament of trying to develop expensive, impractical, and suboptimal policies that segment open public spaces with no natural boundaries to contain deadly force into areas that are weapons-free and those that are not, or of choosing to open to firearms important areas that educate children, bring together families for picnics and camping, and provide a forum for sporting events. Since our founding, Delawareans have entrusted the legislative and executive branches to regulate gun use. By judicial edict, this Court has denied its government the same rights as any other owner of property, to determine whether someone can enter its land and on what conditions. Instead the Majority has made its own policy determination that the interests of those who wish to carry arms on government property outweigh the interests of others in being in a place free of deadly weapons, and more important, in having the governors and cabinet secretaries charged with running our Parks and Forests for the best interests of Delawareans decide how best to do so. And the Majority’s decision, if good law, also has the regrettable consequence of overturning longstanding decisions of two of our state’s counties to prohibit firearms in their county parks. We respectfully dissent.[298] . Del, Dep’t Nat. Res. & Envtl. Control, Park Rules and Regulations § 8.04 (1977); Del. Dep’t .Agric., State Forest Regulations § 7.9 (2003). . 3 Del. Admin. C. § 402-3.2 ("In special circumstances, events, or emergencies, the Secretary or Forestry Administrator may, when it is deemed to be in the public interest, waive a ■ specific regulation or fee.”). . See, e.g,, How to Plan a State Park Field Trip, Del, State Parks, http://www.destateparks. cóm/school/plan.asp (last visited Sept. 8, 2017). . See, e.g., Summer Camps at Delaware State Paries, Del. State Parks, http://www,destate parks.com/programs/summer-camps/index. asp (last visited Sept. 8, 2017) ("Half-day camps for four- tó six-year-olds are offered in summer, as well as full-day camps for six- to seventeen-year-olds. Many camps offer before and after care.... Single- or multi-day school break camps keep kids interested, active and learning when school is closed during the school year.’’). . See, e.g., Activities in Delaware State Parks, Del. State Parks, http://www.destateparks. com/activities/index.asp (last visited Sept. 8, 2017) (activities offered in Parks include adventure racing, biking, mountain biking, birding, camping, disc golf, fishing, geocaching, golf, hayrides, hiking, horseback riding, hunting, music and arts, paddling, picnicking, rock climbing, rappelling, stargazing, summer camps, summer concerts, swimming, and tennis); Delaware State Forests, Del. Forest Serv., http://dda.delaware.gov/forestiy/forest.shtml (last visited Sept. 9, 2017) (activities offered in Forests include hiking, horseback riding, hunting, running, bicycling, cross-country siding, primitive camping, picnicking, and fishing). ... . See, e.g., R.E.E.C.H. at Cape Henlopen, Del. State Parks, http://www.destateparks.com/ SchooI/REECH/ (last visited Sept. 8, 2017) (overnight program for seventh and eighth graders in operation since 1998 and school programs run by the Nature Center since the 1970s). . See, e.g., Kickball, Del. Sports League, https://www.delawaresportsleague.com/ leagues/kickball (last visited Nov. 20, 2017) (adult kickball league competing at Alapocas Run State Park); Schedule Entrance Fees & User Charges, Div. Parks & Recreation 29 (2017), http://www.destateparks.com/ downloads/fees/2017RatesFees Charges .pdf (setting the fee to rent football or soccer fields for youth athletics); Dewey Beach, Beach 5 Sand Soccer Series, http://www.beach5sand soccerseries.com/locations5.php (last visited Nov. 20, 2017) ("best beach soccer tournament on the east coast” with both "youth and adult divisions”); Boys' Soccer—Varsity Schedule, Hawks Sports, https://www.hawks sports.com/page9435 (last- visited Nov, 20, 2017) (high school boys’ varsity soccer practice held at Cape Henlopen State Park). . Verified Compl. for Declaratory and Injunctive Relief, Bridgeville Rifle & Pistol Club v. Small, C.A. No. 11832-VCG, 2016 WL 184665 (Del. Ch. Dec. 21, 2015). . Wilm. C. (Charter) § 6 (1887). . 16 Del. Laws ch. 165, § 8 (1911). . 7 Del. C. § 704(d) (“No person shall shoot at, or kill any bird or animal protected by the laws of this State with any device, swivel or punt gun, or with any gun other than such as is,habitually raised at arm's length and fired from the shoulder. Possession of such illegal device or gun while hunting shall be prima facie evidence of an offense under this subsection.”). . Governor Michael Newbold. Castle, Nat'l Governors Ass'n, https://www.nga.org/cms/ michael-castle (last visited Nov. 21, 2017). . See generally Audio tape: Del. H.B. 554, 133d Gen. Assent. (1986); Audio tape: Del. S.B. 30, 134th Gen. Assem. (1987). . 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008); 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). . Doe v. Wilmington Hous. Auth., 88 A.3d 654 (Del. 2014). . Wilm. C. (Charter) § 6 (1887). . 36C.F.R. § 2.2 (1938). . Del. Dep’t Nat. Res. & Envtl. Control, Park Rules and Regulations (1977). . Majority Op. 636 ("Appellants challenge two regulations adopted by two different State agencies that result in a near total ban of firearms in Delaware’s state parks and forests.”), . District of Columbia v. Heller, 554 U.S. 570, 574, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) ("[The Court of Appeals for the District of Columbia Circuit] held that the Second Amendment protects an individual right to possess firearms and that the city’s total ban on handguns, as well as its requirement that firearms in the home be kept nonfunctional even when necessary for self-defense, violated that right.”) (citing Parker v. District of Columbia, 478 F.3d 370, 395, 399-401 (D.C. Cir. 2007)). . Id.; McDonald v. City of Chicago, 561 U.S. 742, 750, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). .DNREC’s Park Regulation only governs "the use of all applicable lands [etc.] ... administered by the Division of Parks and Recreation.” Del. Dep’t Nat. Res. & Envtl. Control, Park Rules and Regulations § 2.2 (2016). And DOA’s Forest Regulation only governs forests. Del. Dep't Agric., State Forest Regulations § 2 (2007). The Division of Parks and Recreation within DNREC manages 23,-309 acres of land, and the DOA manages 17,762 acres of land. Public Protected Lands, State of Dei.., https://data.delaware.gov/ Recreation/Public-Protected-Lands/whe2-8n4 h/data (last visited Nov. 21, 2017). Given that Delaware comprises 1.3 million acres of land, only three percent of Delaware's acreage is managed by DNREC and DOA as Parks and Forests. Delaware Geography, State of Del., https://delaware.gov/topics/facts/geo.shtml (last visited Nov. 21, 2017). Another 58,269 acres are managed by DNREC’s Division of Fish and Wildlife, but these acres are not subject to the Park Regulation. Public Protected Lands, State of Del., https://data.delaware. gov/Recreation/Public-Protected-Lands/whe2-8n4b/data (last visited Nov. 21, 2017). . Del, Dep’t Nat. Res, & Envtl. Control, Park Rules and Regulations § 8.04 (1977); Del. Dep’t Agric., State Forest Regulations § 7.9 (2003); 3 Del. Admin. C. § 402-3.2. . Alcohol use is permitted at times' in certain parks in areas such as campgrounds. See Del. Dep’t Nat. Res. & Envtl. Control, Park Rules and Regulations^ 20.6 (2016). In pther areas, it is restricted. E.g., 7 Del. Admin. C. § 9201-3.1 (limits or prohibitions are imposed "when such action is deemed necessary for property management, protection of flora, faunas and their habitats or when it is in the best interest of the health, safety, and the general welfare of the visitors”); id. § 9201-20.6 (banning ’ alcohol in Brandywine Creek State Park, Fort Delaware State Park, Wilmington State Parks, and Fox Point State Park); id. § 9201-20.7 (bánning alcohol in rented vessels); id. § 9201-20.8 (banning possession of kegs without permission); id. § 9201-21.5 (prohibiting alcohol consumption while hunting). . See, e.g., Del. Dep't Nat. Res. & Envtl, Control, Delaware State Parks Fall Guid.e, 13, 35, 38 (2017), http://w,ww.destateparks.com/ programs/DSPGuide.asp.. . E.g., 74 Del. Laws ch. 360 (1994) (unlawful to allow a minor to access a firearm by "intentionally or recklessly stor[mg] or leaving] a loaded firearm within the reach or easy access of a minor and where the minor obtains the firearm and uses it to inflict serious physical injury or death upon himself or any other person,” but the firearm being stored in a locked container is an affirmative defense). . See, e.g., Appellants' Amend. Opening Br. 27 (“The need for self-defense certainly exists • in State Parks and Forests where individuals and their families may stay and sleep in expensive cabins, or camp, hike, and hunt in the presence of undomesticated animals and, potentially, criminals.”). .. Correction Statistics By State: Delaware, Nat’l Inst. ■ Corrections, https://nicic.gov/ statestats/?st=de (last visited Nov. 21, 2017) (“The [2015] crime rate in Delaware is about thirteen percent higher than the national average rate.”). . Table 8: Offenses Known to Law Enforcement by State by City, FBI Uniform Crime Reporting (2015), https://ucr.fbi.gov/crime-ih-the-u.s/2015/crime-in-the-u.s.-2015/tables/ table-8/table_8_offenses_known_to_law_ enforcement_by_state_by_city_2015 .xls/view (violent crime rates, defined as the number of violent crimes per 100,000 people, are: 634.8 for Los Angeles, 585.7 for New York City, and 1,707.8 for Wilmington). . Brittany Horn et al:, Wilmington: Most Dangerous Place in America for Youth, News J. (Sept. 8,-2017). ; . Amicus Curiae Bn of Law Enforcement Legal Defense Fund et al. 18, Bridgeville Rifle & Pistol Club, Ltd. v. Small, C.A. No. S16C-06-018 THG, 2016 WL 7428412 (Del. Super. Dec. 23, 2016); see generally Jane Prichard, New Castle County Del., http://www.nccde. org/1308/Jane-Prichard (last visited Nov. 6, 2017). . Doe v. Wilmington Hous. Auth., 88 A.3d 654 (Del. 2014). . Proceedings of the Convention of the Dela-ware State Held at New-Castle on Tuesday the Twenty-Seventh of August, 1776 26 (2d ed. 1927). . Del. Const., art. 24 (1776) ("All acts of Assembly in force in this state on the fifteenth day of May last (and not hereby altered, or contrary to the resolutions of Congress, or of the late House of Assembly of this state) shall so continue until altered or repealed by the Legislature of this state, unless where they are temporary, in which case they shall expire at the times respectively limited for their duration.”). . 1 Del. Laws ch. 4 (1700) ("That who[s]oe-ver [s]hall threaten the per[s]on of another to wound, kill or de[s]troy him, or do him any harm in per[s]on or e[sjtate; and the per[s]on [s]o threatened [s]hall appear before a ju[s]tice of the peace, and atte[s]t, that he believes that by [s]uch threatening he is in danger to be hurt in body or e[s]tate; [s]uch per[s]on [s]o threatening as aforefaid, [s]hall be bound over, with one [sufficient [sjurety, to appear at the next [s]e[s][s]ions or county court, to be holden for the county where [sjuch offence was committed, to be proceeded again[s]t according to law; and, in the mean time, to be of his good behaviour, and keep peace towards all the king’s [sjub-jects.”); Id. ch. 93 ("That if any per[s]on within this government [sjhall challenge any other per[s]on to fight With [sjword, pi[s]tol, rapier, or any other dangerous and destructive weapon, every [sjuch per[s]on [s]o challenging, being legally convicted thereof, by bill, plaint, or information, in any Court, of Quarter Salons within this government, [sjhall forfeit and pay the [sjum of Twenty Pounds, or [sjuffer three, months imprisonment in the common gaol of the [sjaid county.”); id. ch. 51 ("[AJny per[s]ons, to the number of three, or upwards, meet together within this government, with clubs, [sjtaves, or other hurtful weapons, to the terror of any of the peaceable people or inhabitants of the [sjame, and shall commit, or attempt to commit, violence or injury upon the per[s]on or goods of any of the [sjaid inhabitants ... shall be adjudged and puni[s]hed according to the laws and Statutes of Great Britain again[s]t riots and unlawful a[sj[sjemblies.”). . Del. Const., art. 25 (1776). . See, e.g., State v. Huntly, 25 N.C. 418, 420-21 (1843) (citing 4 Bl. Com. 149) (internal citation omitted) (when "a man arms himself with dangerous and unusual weapons in such a manner, as will naturally cause a terror to the people,” this offense "is said to have been always an offence at common law and strictly prohibited by many statutes”). . Del. Const., art. 27-28 (1776) ("To prevent any violence or force being used at the said elections, no persons shall come armed to any of them; and no muster of the militia shall be made on that day .... ”). . Majority Op. 644-46. . Del. Const., art. 25 (1776), . Del. Const, (1776). . Randy J. Holland, The Delaware State Constitution 76 (2d ed. 2017) ("Article XXV of the 1776 Constitution ... provided that the common law of England would remain in force in Delaware until altered by the newly formed General Assembly.”). . Compare■ Del. Const. (1776) with. Del. Const. (1792); see also id. at 13. . Del. Const., art. 25 (1776) (English Common Laws "shall remain in force, unless they shall be altered by a future law of the Legislature.”). The following three constitutions repeated this sentiment, incorporating existing Delaware laws unless inconsistent or altered. Del, Const., art. 8, § 10 (1776) (laws existing at the time of the constitution’s enactment remained in force if “not inconsistent” with the constitution and "unless .., altered by future laws”); Del. Const., art.'7, § 9 (1831) (same); Del. Const., Sched. § 18 (1897) (same). In Quillen v. State, the Supreme Court ■ noted that our law is "in general” the common law of England, "[ajpart from statute.” 110 A.2d 445, 450 (Del. 1955). Addressing Delaware's homicide laws, the court applied English common law because "no important changes in the law of homicide have been made by our legislature.” Id.; see also Delaware Optometric Corp. v. Sherwood, 128 A.2d 812, 816 (1957) (applying the English common law granting courts the duty of maintaining the standards of the - legal profession, because there had not been "any attempt on the part- of the General Assembly to control it”). . Holland, supra note 42, at 76. John Dickinson was President of the 1792 Convention and no stranger to English and Pennsylvania Law, having studied in England as a contemporary of William .Blackstone and having -served as Governor of Pennsylvania from 1782 to 1785. Id. at 12, 34. Many provisions of the 1792 Bill of Rights were identical to the 1790 Pennsylvania Constitution, and the similarities are frequently attributed to' Dickinson’s influence. Id. The only rights found in the Pennsylvania Bill of Rights that Delaware did not adopt, aside from the right to bear arms, were ex post facto laws, impairment of contract laws, and free speech. Id. af 13, The General Assembly also removed the right to form a militia from the 1776 Constitution. Id. . Id. at 88. There is no evidence that the drafters rejected the right to bear arms because the English law already covered the topic—if so, there would' have been no need to adopt any of the amendments that duplicated English law. On the contrary, in Claudio v. State, 585 A.2d 1278, 1296 (Del. 1991), the Supreme Court explained that Delawareans, including the drafters, “were acutely aware of the need to set forth an intention to perpetuate fundamental rights, as they had existed at common law, in unambiguous language.” But the drafters did not include the right to bear arms as one of the fundamental common law rights to be perpetuated; considering and rejecting it instead. . PA. Const., art. 1, § 21 (1790). See also PA. Declaration of Rights, cl. XIII ("That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And that the military should be kept under strict subordination to, and governed by, the civil power.”). . Proceedings of the House of Assembly of the Delaware State 1781-1792 and of the Constitutional Convention of 1792 785 (Claudia L, Bushman et al. eds., 1988). . Id. . Doe v. Wilmington Hous. Auth., 88 A.3d 654, 663-64 (Del. 2014). . Id. (quoting District of Columbia v. Heller, 554 U.S. 570, 594-95, 598-99, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008)). . Id. . Justice Antonin Scalia, Judicial Adherence to the Text of Our Basic Law: A Theory of Constitutional Interpretation, Address at the Catholic University of America (Oct. 18, 1996) (“You will never hear me refer to original intent, because I am first of all a textualist, and secondly, an originalist. If you are a textualist, you don’t care about the intent, and I don’t care if the Framers of the U.S. Constitution had some secret meaning in mind when they adopted its words. I take the words as they were promulgated to the people of the United States, and what is the fairly understood meaning of those words.”). . Majority Op. 650-51. . Consistent with this reality, by 1792, England had long restricted where guns could be possessed, enacting in 1328 the Statute of Northampton, which stated that no person shall "go nor ride armed by Night nor by Day in Fairs, Markets” as a means of prohibiting the private use of arms to promote individual justice and preventing armed overthrow of the government. Patrick J. Charles, The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review, 60 Clev. St. L. Rev. 1, 8, 13 (2012). Later laws prohibited shooting within a quarter-mile of a city or market and traveling on a highway with a loaded gun, as well as carrying small handguns within the court or a three-mile radius of it. Lois G. Schwoerer, Gun Culture in Early Modern England 59, 61 (2016) (citing 3 Statutes of the Realm 832-35 (Alexander Luders et al. eds., 1963)). And laws setting the length of a lawful handgun to no less than "one whole yarde” had the effect of preventing concealed carry. Id. at 59. These length restrictions were meant to address "little shorte handguns and little hagbuttes” responsible for "detestable and shameful murders, robberies, felonies, riot and route.” Id. . Heller, 554 U.S. at 593, 128 S.Ct. 2783 (the English Bill of Rights, "long understood to be the predecessor to our Second Amendment,” was “like all written English rights ... held only against the Crown, not Parliament”) (internal citations omitted); id. at 665, 128 S.Ct. 2783 (Stevens, J., dissenting) (the right to bear arms in the English Bill of Rights "was only available subject to regulation by Parliament (‘as allowed by Law’).”) (internal citation omitted). . See, e.g., Barron v. Mayor of Baltimore, 1 Pet. 243, 248-49, 32 U.S. 243, 8 L.Ed. 672 (1833) (holding that the first eight Amendments to the Federal Constitution only applied to the federal government and did not extend to the states); Akhil R. Amar, The Bill of Rights: Creation and Reconstruction 128 (1998) (the consensus that the Bill of Rights did not "b[i]nd state governments,” "epitomized by Barron v. Baltimore," "survived well into [the twentieth] century.”). . See Joseph Blocher, Firearm Localism, 132 Yale L.J. 82, 119 (2013) (citing An Act to Prevent the Discharging of Fire-Arms Within the Towns and Villages, and Other Places Within this State, and for Other Purposes, 4 Del. Laws ch. 329 (1812)); see also Robert H. Churchill, Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment, 25 Law & Hist. Rev. 139, 163 (2007) (citing An Act to Prevent the Discharge of Firearms Within Towns and Villages, Del. Sess. Laws 1812). The Act provided for exceptions for "days of public rejoicing,” where authorization was provided by state law, or where deemed necessary. Id. . Revised Statutes of the State of Delaware, to the Year of Our Lord One Thousand Eight Hundred and Fifty-Two 333 (Dover, W.B. Keen 1852). . 42 Del. Laws ch. 180, § 2 (1939). . Wilm. C. (Charter) § 6 (1856). . 19 Del. Laws ch. 266 (1891). . Farrow v. Hoffecker, 79 A. 920, 921 (Del. Super. 1906). . E.g. Davis v. Commonwealth of Mass., 167 U.S. 43, 47, 17 S.Ct. 731, 42 L.Ed. 71 (1897), distinguished by Hague v. Comm. for Indus. Org., 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) ("As representative of the public, [the legislature] may and does exercise control over the use which the public may make of such places, and it may and does delegate more of less of such control to the city or town immediately concerned. For the legislature absolutely or conditionally to forbid public speaking in a highway or public park is no more an infringement of the rights of a member of the public than for the owner of a private house to forbid it in his house. When no proprietary rights interfere, the legislature may end the right of the public' to enter upon the public place by putting an end to the dedication to public uses. So it may take the less step of limiting the public use to certain purposes.”); Light v. United States, 220 U.S. 523, 536, 31 S.Ct. 485, 55 L.Ed. 570 (1911) ("[T]he nation is an owner, and has made Congress the principal agent to dispose of its property.... Congress is the body to which is given the power to determine the conditions upon which the public lands shall be disposed of. The government has, with respe'ct to its own lands, the rights of an ordinary proprietor to maintain its possession and to prosecute trespassers.... All the public lands of the nation are held in trust for the people of the whole country, And it is not for the courts to say how that trust shall be administered. That is for Congress to determine. The courts cannot compel it to set aside the lands for settlement, or to suffer them to be used for agricultural or grazing purposes, nor interfere when, in the exercise of its discretion, Congress establishes a forest reserve for what it decides to be national and public purposes. In the same way and in the exercise of the same trust it may disestablish a reserve, and devote the property to some other national and .public purpose. These are rights incident to proprietorship, to say nothing óf the power of the United States as a sovereign over the property belonging to it. Even a private owner would be entitled to protection against willful trespasses ....”) (internal citations omitted); see also Restatement (First) of Property, § 521 (1936) ("The fact that one has that, relationship to land which is called possession is sufficient in and of itself to induce the law to give him protection as having a property interest against the world at large. To receive protection as the owner of a pos-sessory interest one must have, in general, such a physical relation to the land as to give him a certain degree of physical control over it, and an intent to so exercise such control as to exclude other members of society, in general, from any present occupation of it."'). . David v. State, 89 A. 214, 214 (Del. Super. 1913) (citing Del. Rev. Code ch. 128, § 21). Furthermore, property owners owed no duty of care to trespassers. Villani v. Wilmington Hous. Auth., 106 A.2d 211, 213 (Del. Super. 1954) ("The law is well settled that an owner or person in charge of property has no duty to a trespasser, except to refrain from injuring him intentionally, wilfully, or wantonly.”). . An Act to Prevent Trespasses Being Commit- . ted on the Lands on. the North East Side of Lewis-Creek, Called the Cape, in the Co.unty of Sussex, Revised Statutes of the State of Dela-ware, to the Year of Our Lord One Thousand Eight Hundred and Fifty-Two 124 (Dover, W.B. Keen 1852). . Paul Dolan, Organization of Delaware State ■Administration 13 (1951). . Id. at 58 ("No inherent power of appointment or removal resides in the Delaware governor.”) (citing Collison v. State, 39 Del. 460, 2 A.2d 97 (1938) and State v. Wise, 200 A. 418, 421 (1938)). . Carol E. Ho'ffbcker, Wilmington, Delaware: Portrait of an Industrial City, 1830-1910 74 (1974). . 17 Del. Laws ch. 204, § 1 (1883). . Susan Mulchahey Chase, David L. Ames, & Rebecca J. Siders, Suburbanization in the Vicinity of Wilmington, Delaware, 1880-1950+/-: A Historic Context 16, . 17 Del. Laws ch. 204, §§ 6, 7.(1883) (prohibiting alcohol, political gatherings, and meetings assembled through advertising). "[F]or the better preservation of the public peace and order," the General Assembly extended all laws and regulations of the City of Wilmington to the city parks, Id. § 6. . Id. (Board of Parks Commissioners can develop rules and regulations "not inconsistent with the laws and constitution of the United States or of the State of Delaware or with the ordinances of the City of Wilmington”). . Wilm. C. (Charter) § 6 (1887). . Report of the Board of Park Commissioners 25 (1898). The 1898 rule remained in effect through 1910. Report of the Board of Park Commissioners 25 (1910). And the "Condensed Park Rules” published in the Board of Park Commissioners’ 1912 annual report stated: "Firearms not permitted in parks,” Report of the Board of Park Commissioners 10 (1912). . See, e.g., 16 U.S.C. § 26 (in Yellowstone National Park, "[a]ll guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons within said park limits when engaged in killing, trapping, ensnaring, or capturing such wild beasts, birds, or wild animals shall be forfeited to the United States ... and may be seized by the officers in said park and held pending the prosecution of any person or persons arrested under charge of violating the provisions of this section”). , . 36 C.F.R. § 2.2 (1938). . 41 Del. Laws ch. 259, § 1 (1937) (authorizing the State Park Commission to "preserve and protect the scenic, historic, scientific, prehistoric and wildlife resources of the State, and to make them available for public use and enjoyment”). . Id. §§ 2, 3. . Id. § 2 ("All state parks and other areas acquired primarily for recreational use shall, from the date of their establishment as such, come under the jurisdiction of the State Park Commission of Delaware and be closed to hunting.”). . Editorial, Gunning in the Park, Journal-Every Evening (Oct. 24, 1951) (calling for an overturning of a "blanket ban on shooting in state parkland”). . State Park Commission of Delaware, Rules and Regulations for Use of State Parks § 10 (1962). . 56 Del. Laws ch. 407 (1968) ("All State Parks and other areas acquired primarily for recreational use shall, from the date of their establishment as such, come under the jurisdiction of the State Park Commission of Dela-ware and shall be closed to hunting, except in areas designated by the Commission for such purpose.”). . Del. Dep’t Nat. Res. & Envtl. Control, Park Rules and Regulations § 9.01(b) (1969) (“The display or discharging of firearms upon the lands and waters administered by the Commission is prohibited without prior written permission, except in those areas designated for hunting and trapping by the State Park Commission.”). . 57 Del. Laws ch. 302, § 1 (1969) (DNREC assumed the responsibilities of various State-created commissions, including the Board of Game and Fish Commissioners, the State Park Commission, and the State Forestry Department). In this period of transition, existing agency regulations were left in place until revoked or changed by DNREC. Id. In 1970, references to the State Park Commission and references to the State Forestry Department were replaced with references to DNREC. 57 Del. Laws ch. 739 (1970). . 25 Del. Laws ch. 71, § 1 (1909). . Id. § 6 (the State Forester and forest wardens had the duty to "enforce all forest laws of this State; to protect all public lands or State forest reserves and see that all rules, regulations and laws are enforced”); see generally W.D. Sterrett, Report on Forest Conditions in Delaware and a Forest Policy for the State 47 (1907) (suggesting that the General Assembly create a State Forestry Department, acquire non-productive land to be used as Forests, and protect trees with aesthetic and commercial value, in recognition of the fact that the concentrated effort necessary “to put an end to forest destruction, lies within the State—its government and private land owners."). Responsibility for the conservation, management, and promulgation of rules and regulations for Forests moved to the State Board of Agriculture in 1921, the State Forestry Department in 1927, and DNREC’s Division of Parks, Recreation, and Forestry in 1969, before moving to DOA in 1974. 32 Del. Laws ch. 39, § 1 (1921); 35 Del. Laws ch. 50, §§ 1, 4 (1927); 57 Del. Laws ch. 302, § 1 (1969); 59 Del. Laws ch. 372, § 1 (1974). . 16 Del. Laws ch. 165, § 8 (1911). . 16 Del. Laws ch. 548, § 1 (1881); State v. Costen, 39 A. 456, 456 (1897). . 16 Del. Laws ch. 548, § 3 (1881). This prohibition, “a most excellent and necessary one,” recognized that "the reckless use of firearms is entirely too common with very many people” and was enacted for the two-fold purpose of preventing loss of life by the acts of irresponsible people who are prone to jest with deadly weapons, and to punish others who endanger life by the use of such weapons, not jestingly but seriously, yet .in a manner to escape indictment for assault with intent to commit murder. Remarks of the Court in Imposing Sentence, State v. Naylor, 90 A. 880, 891 (Del. 1913); State v. Gam, 74 A. 7, 7 (Ct. Gen. Sess. 1909). . Eligibility to be licensed required the applicant to: (1) submit the certificate of five persons within the same election district attesting to the applicant’s age, sobriety, and good moral character, reputation for peace and good order in the community, and the necessity of carrying a concealed deadly weapon; (2) publish the applicant’s name and address in a daily newspaper before the application was to be considered; and (3) obtain approval by the Court of General Sessions, after an evidentiary hearing. 26 Del. Laws ch. 275 (1911). . Id. (citing State v. Ingram, 26 Del. 439, 84 A. 1027 (Ct. Gen. Sess. 1912)). . State v. Iannucci, 55 A. 336, 336 (Ct. Gen. Sess. 1903). This understanding of the right to use a firearm in self-defense was consistent with the development of self-defense as a justification: Where one is assaulted upon a sudden affray and reasonably believes himself to be in imminent danger of being killed or of receiving great bodily harm, he may use a deadly weapon in self-defense. But in exercising such right of defense, he must be closely pressed, and must have retreated as far as he conveniently and safely could, in good faith, with the honest intent to' avoid the violence and peril of the assault upon him. State v. Lee, 74 A. 4, 5 (Ct. Gen. Sess. 1909). . 16 Del. Laws ch. 155, §§ 1, 8 (1879) (“[T]ramps,”i i.e., "[a]ny person without a home in the town or hundred in which he may be found wandering about without employment, and the regular and visible means of living,” were guilty of a misdemeanor if found carrying a firearm.). . 26 Del, Laws ch. 164 (191)) (any "unnatu-ralized foreigner” hunting while in possession of a firearm without the required hunting license was guilty of a misdemeanor); 30 Del. Laws ch, 176, § 7 (1919) (minors under the age of fifteen prohibited from hunting anywhere in the State with any kind of rifle or shotgun unless accompanied by an adult who is lawfully hunting). . 56.Del. Laws ch. 384, § 1 (1968).' . 17 Del. Laws ch. 507, § 5 (1885); 16 Del. Laws ch. 165, § 8(1911). . 41 Del. Laws ch. 212 (1937). . The two earliest cases considering whether the first eight Amendments applied to the states found that they did not. Barron v. Mayor of Baltimore, 7 Pet. 243, 248-49, 32 U.S. 243, 8 L.Ed. 672 (1833); Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 79, 21 L.Ed. 394 (1872). . United States v. Cruikshank, 92 U.S. 542, 552, 23 L.Ed. 588 (1875). . Presser v. Illinois, 116 U.S. 252, 265, 6 S.Ct. 580, 29 L.Ed. 615 (1886). . 153 U.S. 535, 538, 14 S.Ct. 874, 38 L.Ed. 812 (1894). . 307 U.S. 174, 178, 59 S.Ct. 816, 83 L.Ed. 1206 (1939) ("With obvious purpose to assure the continuation and render possible the effectiveness of such forces the declaration and guarantee of the Second Amendment were made. It must be interpreted and applied with that end in view.”). . See, e.g., Majority Op. 645-46, 650-52. In particular, the Majority cites to Article VII of the 1689 English Bill of Rights, which provided that Protestant subjects: "may have Arms for their Defence suitable to their Conditions, and as allowed by Law.” Id. at 645-46 (citing District of Columbia v. Heller, 554 U.S. 570, 593, 128 S.Ct. 2783, 171 L.Ed.2d 637; 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441) (emphasis added). But support in the English tradition for a broad unwritten state constitutional right to bear arms is inconsistent with that Article’s explicit limitation of the right as existing only “as allowed by law.” Peter Buck Feller & Karl L. Gotting, The Second Amendment, A Second Look, 61 Nw. U. L. Rev. 46, 48 (1966). . See supra note 55. . Seizure of Arms Act, 1 Geo. 4, ch. 2 (1820) (Eng.). . Thé Gun License Act, 33 & 34 Viet., ch. 57 (1870) (Eng.). . Pistols Act, 3 Edw. 7, ch. 18 (1903) (Eng.) (prohibiting drunk persons and those “not of sound mind” from owning guns). . Firearms Act, 10 & 11 Geo. 5,.ch, 43, s. 1, 1(2), l(2)(a) (1920) (Eng.) (firearm certificates were only to be granted for “good reason[s]” and never to anyone "of intemperate habits or unsound mind” or "for any reason unfitted to be trusted with firearms”). . See Firearms (Amend.) Act of 1997, ch. 27, s. 5(1), 5(3), 5(A),'12(2) (Eng.) ("[A]ny firearm which either has a barrel less than 30 centimeters in length, or is less than. 60. centimeters in length overall, other than an air weapon, a small-calibre pistol, a muzzle-loading gun or a firearm designed as signaling apparatus” is a "weapon[] subject to general prohibition.” It is a crime to possess, such a weapon without authority “given in writing by the Secretary, of State (in or as in regards England and Wales), or the Scottish Ministers (in or as regards Scotland)" unless the gun is being used in a theatrical performance approved by the Defence Council to showcase the prohibited weapon, or the gun is being “kept or exhibited as a part of a collection.”); HM Government, Ending Gang and Youth Violence: A Cross-Government Report 45 (2011) ("The last 20 years have seen a significant toughening of the laws on weapons possession and supply including a ban on all handguns ....”); Firearms (Amend.) Act of 1988, ch, 45 (Eng.) (banning "semi-automatic and pump-action rifles; weapons which fire explosive ammunition; short shotguns with magazines; and elevated pump-action and self-loading rifles”). . See, e.g., Firearms (Amend.) Act of 1988, ch. 45 (Eng.) (mandating registration for shotguns, "which were required to be kept in secure storage”). . An applicant must demonstrate they use their firearm on a "regular, legitimate basis for work, sport or leisure (including collections and research)” to be granted a firearm certificate. Firearms (Amend.) Act of 1997, ch. 27, s. 27(b), s. 28(lA)(b) (Eng.). The chief of police may subject any certificate to individualized restrictions. Id. s. 27(1A)(2), s. 28(1 C)(b). . For example, in a city with less than one percent of the United Kingdom’s population, Wilmington has already this year suffered forty-eight percent of the homicides by firearm that entire country expects in any given year. Adam Duvernay, Total Shooting Victims in Wilmington Surpasses 2013, News J. (Sept. 25, 2017) (twenty-five people in Wilmington had been lulled by gunfire as of September 25, 2017); Interactive Maps and Charts of Armed Violence Indicators, Small Arms Survey, http:// www.smallarmssurvey.org/tools/interactive-map-charts-on-armed-violence.html (last visited Nov. 21, 2017) (on average, fifty-two people in the United Kingdom died of homicide by firearm per year between 2010-2015); Population, Total, World Bank, https ://data. worldbank.org/indicator/SP.POP.TOTL (last visited Nov. 21, 2017) (sixty-five million people live in the United'Kingdom); Quick Facts: Wilmington City, Delaware, U.S. Census Bureau, https://www.census.gov/quickfacts/fac1/ table/wilmingtoncitydelaware,DE/PST045216 (last visited Nov. 21, 2017) (about 71,000 people live in the city of Wilmington). . Homicide by firearm is thirty-one times more common in the United States than in England and Wales. Homicide Statistics: Homicide by Firearm, United Nations Off. on Drugs & Crime, https://www.unodc.org/ documents/data-and-analysis/statistics/ Homicide/Homicides_by_firearms.xls (last visited Nov. 21, 2017) (the United States' homicide by firearm rate per 100,000 people in 2009 was 3.3, compared to 0.1 in England and Wales). In fact, being lulled by a gun in England is about as likely as dying of contact with agricultural machinery here in the United States. Kevin Quealy & Margot Sanger-Katz, Comparing Gun Deaths by Country: The U.S. Is in a Different World, N.Y. Times (June 13, 2016). . See, e.g., Research and Surveys: Common pheasant Phasianus colchicus, Game & Wildlife Conservation Tr., https://www.gwct.org. uk/research/long-term-monitoring/national-gamebag-census/bird-bags-summary-trends/ common-pheasant/ (last visited Nov. 21, 2017) (the number of pheasants shot during recorded hunting activities in the United Kingdom was two and a half times greater in 2010 than in 1961). At the iconic Rules, its "Famous Grouse” is touted with the fair warning that "game birds may contain lead shot.” Menu, Rules, http://www.rules.co.uk/wp-content/ uploads/2013/11/Menu-food.pdf (last visited Nov. 21, 2017). .See supra notes 48-55 and accompanying text. . See supra notes 102-103 and accompanying text. . See supra Part IV, Sections A-D. . Id. .See supra notes 16-17, 82. . Del, Dep't Nat, Res. & Envtl. Control, Park Rules and Regulations § 8.04 (1977). . Id. § 10.01(f). . Del. Dep’t Agric,; Forest Rules and Regulations § 8 (197.9). . 56 Del. Laws ch. 85, §■ 1 (1967). • . For example, DNREC set the hours parks were open to' the public, limited the number of consecutive days people could camp in state parks, prohibited alcohol within organized youth group camps, and charged an entrance fee for certain parks, as permitted by the General Assembly. Del. Dep’t Nat. Res. & Envtl. Control, Park Rules and Regulations §§ 1, 2.16, 3.04(a), 11 (1977). And DOA’s regulation of Forests mirrored DNREC’s regulation of Parks. DOA prohibited the building of a fire except in certain designated areas, restricted camping to one day except with a written permit, and prohibited the cutting of its standing trees and shrubs. Del. Dep’t Agric., Forest Rules and Regulations §§ 1, 2 (1979). . 60 Del. Laws ch. 585 (1976) (codified at 29 Del C. § 6441(d)); Baker v. Del. Dep’t of Nat. Res. & Envtl. Control, 2015 WL 5971784, at *12 (Del. Super, Oct. 15, 2015) (citing 29 Del. C: § 10161(b)) ("DNREC, as an agency, is. subject to subchapter I (Policy and Definitions, consisting of §§ 10101 and 10102 of Title 29) and subchapter II (Agency Regulations, consisting of §§ 10111-19 of Title 29) of the APA as well as § 10141 (review of regulations), § 10144 (stay pending review) and § 10145 (commencement of review). If DNREC promulgates regulations, those regulations must comply with the APA.”). . We also note that, in the time period between 1977 and 1987, the General Assembly continued to restrict the possession and use of firearms in the State. See, e.g,, 61 Del, Laws ch. 372, § 1- (1978) (prohibiting the discharge of a firearm within fifteen yards of a public road or right-of-way unless it is a road or right-of-way within an area controlled by the agencies charged with management of certain state or federal land and designated as open to hunting or trapping); 64 Del. Laws ch. 373, § 1 (1984) (same); id. ch. 653, § 1 (establishing Safety Zones and making it unlawful for any “person, except the owner or occupant, [to] discharge a firearm within i 00 yards of an occupied dwelling, house or residence or any bam, stable or any other building used in connection therewith, while hunting or trapping of wild birds [or] wild animals of any kind.”); id. ("[I]t shall be unlawful to shoot at any wild bird or wild animal while it is within such safety zone without the specific advance permission of the owner or tenant.”). . 36 C.F.R. § 2.2 (.1938). . Although the Department of the Interior in 1983 established limited exceptions permitting travelers and those living within national parks to carry unloaded arms, it did so not because of a recognition that its existing policy violated an individual right to bear arms, but rather, because enforcing the prohibition was infeasible from an administrative perspective, and required horseback riders and those traveling on foot to secure a permit to carry a firearm'. Id. . Kent Cíy. C. § 168-35 (Í981)'; see also Kent County Dep’t Cmty. Servs., General Park Rules § Í (2013), http://www.co.kent.de.us/ media/766210/General-park-rulesl2013 .pdf. . United States v. Miller, 307 U.S. 174, 178, 59 S.Ct. 816, 83 L.Ed. 1206 (1939) (the Second Amendment guarantees no right .to keep and bear, a firearm that does not have “some reasonable relationship to the preservation or efficiency of a well regulated militia”); see also Lewis v. United States, 445 U.S. 55, 65, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980) (“These legislative Restrictions on the use of firearms are neither based upon constitutionally suspect criteria, nor do they trench upon any constitutionally protected liberties.”); United States v. Casson, 288 F.Supp. 86, 88 (D. Del. 1968) (“In the absence of some showing that the possession or use of the shotgun bears some reasonable relationship to the preservation or efficiency of a well regulated Militia, the Second Amendment does not guarantee defendant the right to keep and bear such a firearm.”). . Jámes Podgers, First Legal Shots Fired over Handgun Ordinance, 67 Am. Bar Ass’n J. 969, 969 (1981) (NRA general counsel James Featherstone said that "Despite Miller, the Second Amendment does protect the right to possess handguns.”); Reva B. Siegel, Dead or Alive: Originalism as Popular Constitutionalism in Heller, 122 Harv. L. Rev. 191, 224-25 (2008) ("Even though the number of law review articles on the right to bear arms increased in the 1980s, at least nineteen, of the twenty-seven articles written between 1970 and 1989 espousing the view that the Second Amendment protected an individual right to bear arms were 'written by lawyers who had been directly employed by or represented the NRA or other gun rights organizations, although they did not always so identify themselves in the author's footnote.’ ”) (quoting Carl T. Bogus, The History and Politics of Second Amendment Scholarship: A Primer, in The Second Amendment in Law and History 1, 4 (Carl T. Bogus ed., 2000)). . Patrick J. Charles, The.Faces of the Second Amendment Outside the Home, Take Two: How. We Got Here and Why It Matters, 64 Clev. St. L. Rev. 373, 471 (2016) (citing David Conover, To Keep and Bear Arms, Am. Rifleman, Sept. 1985, at 40-41); Darrell A.H. Miller, Institutions and the Second Amendment, 66 Duke L.J. 69, 115-16.(2016) ("[T]he NRA has translated its vision of the Second Amendment into gun-rights legislation and 'strict scrutiny’ protections in state constitutions.’’). . In the late 1980s, the NRA switched its attention from the national stage to state firearm regulations, lobbying simultaneously for state constitutional amendments and local preemption laws. Harry S. Wilson, Gun Politics in America: Historical and Modern Documents in Context 408 (2016) ("[T]he NRA became more active in state politics when, it was evident that the national-level pendulum might be swinging toward gun control advocates.”). The NRA' argues- preemption laws are necessary because varying local laws create confusion. Firearm Preemption Laws, NRA, https://www.nraila.org/issues/ preemption-laws/ (last visited Nov. 20, 2017). But most believe the true reason behind the preemption push .was the NRA’s desire to "avoid having to fight the issue of gun control in thousands of city and town halls across the country.” William S. Harwood, Gun Control: State Versus Federal Regulation of Firearms, 11 Me. Pol’y Rev. 58, 65 (2002). The NRA succeeded on its preemption campaign, increasing the number of states with laws preempting local regulation from seven to forty-five. Joe Palazzolo, Gun Rights Groups Target Local Rules, Wall St. J. (Feb. 6, 2013 9:23 AM), https://blogs.wsj.com/law/2013/02/ 06/how-gun-rights-groups-suppressed-local-firearm-regulations/; Rebecca Leber, City Falls to NRA Campaign to Repeal Local Laws Preventing Gun Violence, ThinkProgress (June 3, 2013, 9:20 PM), https://thinkprogress.org/ city-falls-to-nra-campaign-to-repeal-local-laws preventing-gun-violence-83ed9f761f66. .Nev. Const., art. I, § 11(1) (1982) ("Every citizen has the right to keep and bear arms for security and defense, for lawful hunting and recreational use and for other lawful purposes.”); N.H. Const.; pt. 1, art. 2-a (1982) (“All persons have the right to keep and bear arms in defense of themselves, their families, their property and the state.”); N.D.. Const., art. I, § 1 (1984) ("All individuals ... have certain inalienable rights, among which are ... to keep and bear arms for the defense of their person, family, property, and the state, and for lawful hunting, recreational, and other lawful purposes."); Utah Const,, art. I, § 6 (1984) (‘‘The individual right of the people to keep and bear arms for security and defense of self, family, others, property, or the state, as well as for other lawful purposes shall not be infringed; but nothing herein shall prevent the legislature from defining the lawful use of arms.”); N.M. Const., art. II, § 6 (1986) (‘‘No law shall abridge the right of the citizen to keep and bear arms for security and defense, for lawful hunting and recreational use and for other lawful purposes, but nothing herein shall be held to permit the carrying of concealed weapons. No municipality or county shall regulate, in any way, an incident of the right to keep and bear arms.”); W. Va. Const,, art. Ill, § 22 (1986) ("A person has the right to keep and bear arms for the defense of self, family, home and state, and for lawful hunting and recreational use.”). Maine adopted its version, which looks like'the 1776 Pennsylvania Constitution’s, in November 1987. Me. Const., art. I, § 16 (1987) ("Every citizen has a right to keep and bear arms and this right shall never be questioned.”). . Audio tape: Del. S.B. 30, 134th Gen. Assem. 19:15 (1987); Appellants’ Amend. Opening Br. 2 n,4 (“Plaintiff Below/Appellant Delaware State Sportsmen’s Association has been Delaware’s affiliate of the National Rifle Association since 1968.”); see also Patrick J. Charles, supra note 133, at 433-75 (2016) (describing the NRA’s campaign to amend state constitutions); J. Warren Cassidy, United We Stand, Am. Rifleman, Feb. 1989, at 7 ("Through preemption bills, right to keep and bear arms amendments in the state constitutions, and the reform of onerous permit to carry concealed laws, we are attempting, with good success, to restore citizens’ Second Amendment rights wherever these have been abridged.”). . Del. H.B. 66, 133d Gen. Assem. (1985) (codified at 22 Del. C. § 835(a)(6) and 9 Del. C. § 330(c)). . Id. . Del. Const., art. 16, § 1. . Id. . Id. . See supra note 134. . Del. H.B. 66, 133d Gen. Assem. (1985) (codified at 22 Del. C. § 835(a)(6) and 9 Del. C. § 330(c)). . Eileen Gilligan, Ban on Local Gun Laws Sent to Governor, Morning News (Wilmington) Del.), May 28, 1986, at 13 (describing legislation proposed by Wilmington City Councilwoman Loretta Walsh that she pushed "after she .claimed to have found a loophole in a similar law that prohibits municipalities from banning guns through charter changes”). .Del. H.B. 430, 133d Gen. Assem. (1986) (codified at 22 Del. C. § 838). ■ . Del. H.B. 554 syn„ 133d Gen. Assem. (1986) (codified at 22 Del. C. § 838). . Del. Const., art. I, § 20 (1987). . Audio tape: Del. H.B. 554, 133d Gen. Assem. 2:00 (1986). . Id. at 2:38. . Id. at 3:55. ' .Under the Doctrine of Selective Incorporation, certain rights in the Bill of Rights are made applicable to the states “because a denial of them would be a denial of Due Process of law.” Malloy v. Hogan, 378 U.S. 1, 5, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); see also Thomas J. Walsh, The Limits and Possibilities of Gun Control, 23 Cap. U. L, Rev. 639, 656-57 (1994); . Audio tape: Del. S.B. 30, 134th Gen. Assem. 16:30 (1987); see id. at 19:30 (“[I]n order to confirm what most Delawareans believe, we have proposed this [Amendment] ... to protect our right to keep and bear arms as an individual matter.”). . See Quilici v. Vill. of Morton Grove, 695 F.2d 261, 271 (7th Cir. 1982). . Tom Greer, NRA Pushes Amendment, Morning News (Wilmington, Del.), Apr. 15, 1987, at 27 (emphasis added). . Audio tape: Del. S.B. 30, 134th Gen. Assem. 19:30(1987). . Id. at 44:50. . Senator McDowell questioned Thompson about whether any jurisdiction in the State of Delaware had banned the ownership of weapons, and Thompson conceded that none had. Id. at 29:45. . Id. at 35:15. . Mat 16:25. . Greer, supra note 154, at 27. . 66 Del. Laws ch. 10 (1987). Our friends in the Majority accuse us of "cherrypicking'’ statements by legislators in the debates. Majority Op. 649, n.85. But, they cite to nothing in the debates to support the notion that Section 20 was intended to be broader than the Second Amendment, because there is no mention of their interpretation. Doe's interpretation is also inconsistent with how other states have interpreted the same or similar constitutional provisions. See infra note 236-239 and accompanying text. . See generally, Alonzo H. Garcelon, The President’s Column, Am. Rifleman, Dec. 1985, at 47 ("Thanks to the efforts of the ILA [the NRA Institute for Legislative Action] and you, the NRA member, anti-gun proposals at all levels of government have been beaten back while laws strengthening the right to .keep and bear arms have been enacted across the nation. Consider that 24 states now have firearm pre-emption laws that will prevent local towns and city governments from enacting handgun bans and other anti-gun laws; fourteen states have enacted hunter harassment laws; and 40 states have constitutional amendments to keep and bear arms. All of this is a direct result of efforts by ILA.”). ; See, e.g., Mission, Del. State Sportsmen’s Ass’n, http://dssa.us/mission/ (last visited Nov. 21, 2017) (“For over 20 years, the DSSA has stood ever vigilant in defense of the right to keep and bear arms. Through our efforts, with the support of the National Rifle Association, the rights of the people of[] Delaware have not been compromised.”); Appellants’ Amend. Opening Br. 2 n.4 ("Plaintiff Below/Appellant Delaware State Sportsmen’s Association has been Delaware’s affiliate of ■the National Rifle Association since 1968.”) (internal citations omitted). For an example of the DSSA’s continued involvement in the De-laware legislative process, see Governor Jack Markell Unveils Gun Control Plan to Leave You Defenseless, Del. State Sportsmen's Ass’n (Jan. 16, 2013), http://dssa.us/2013/01/16/ governor-jack-markell-unveils-gun-control-planto-leave-you-defenseless/ (urging DSSA members to "[c]all and e-mail IMMEDIATELY and make [their] voicefs] be heard on” Governor Markell’s “broad gun control plans” to ban semi- automatic firearms, restrict magazine capacity, mandate reporting of lost or stolen guns, require background checks for private firearm sales, and create a "gun free” zone around schools). . 67 Del. Laws ch. 41 (1989). . Application of McIntyre, 552 A.2d 500, 501 n.1 (Del. Super. 1988) (reviewing the renewal of concealed carry permit and rejecting the Petitioner’s argument that her position is enhanced by the adoption of Section 20, stating: "The Court notes that ‘the right to keep and bear arms’ does not of necessity require that such arms may be kept concealed.”),. . . Application of Wolstenholme, No, 92M-04-006, 1992 WL 207245, at *1 (Del. Super. Aug. 20, 1992). . Id. . Smith v. State, 882 A.2d 762, 2005 WL 2149410 (Del. Aug. 16, 2005) (TABLE), . 72 Del. Laws ch. 329 (1990). . Short v. State, 586 A.2d 1203, 1991 WL 12101, at "T (Del. Jan. 14, 1991) (TABLE) ("Courts throughout the country in considering statutes similar to 11 [Del. C.] § 1448 have uniformly ruled that the right to bear arms as guaranteed in various state constitutions and the federal constitution may be subject to reasonable restrictions for the public safety ....”). . 69 Del. Laws ch. 360 (1994). A person violated' the statute if by "intentionally or recklessly storing] or leaving] a loaded firearm within the reach or easy access of a minor and where the minor obtains the fire- • arm and uses it to inflict serious physical injury or death upon himself or any other person,” but could assert an affirmative defense when, among other possible factors, the firearm was stored in a locked container.* Id. . 70 Del. Laws ch. 159 (1995). . See Carson v. Springfield Coll., C.A. No. 05C-10-002-PLA., 2006 WL 2242732, at *3 (Del. Super. Aug. 4, 2006) ("[A] fundamental element of private property is the right to regulate access to it.”), . See Richard Epstein, Takings: Private Property and the Power of -Eminent Domain . 63 (1985) (stating that the "notion of exclusive possession” is "implicit in the basic conception of private property”); see also, e.g., Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (“The power to exclude has traditionally been considered one of the most treasured strands in an owner’s bundle of property rights.”); Dolan v. City of Tigard, 512 U.S. 374, 393, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) (quoting Kaiser Aetna v. United States, 444 U.S. 164, 176, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)) (“[T]his right to exclude others is ‘one of the most essential sticks in the bundle of rights that are commonly characterized as property.’"). .See United States v. Curtis-Nevada Mines, Inc., 611 F.2d 1277, 1283 (9th Cir. 1990) ("Historically the United States has managed the lands within the public domain as fee owner and trustee for the people of the United States. Also, in the management of public lands, the United States has historically allowed the general public to use the public domain for recreation and other purposes, and often without a specific, formal permit. Such access has been described as an implied license.”); Armuchee Alliance v. King, 922 F.Supp. 1541, 1548-49 (N.D. Ga. 1996) (noting thát “[b]ecause Congress’s power over public lands ‘is without limitations,’ any right to use and occupy national forests is strictly a statutory benefit” and that' there is no liberty or property interest in using or occupying the forest, but rather, use of the forest “is a privilege, not a right”); United States v. Patzer, 15 F.3d 934, 941 (10th Cir. 1993) (holding that a two-year prohibition on recreational activity ' on any U.S. Forest Land or national park in Wyoming or the United States is reasonable for a conviction of engaging in a commercial service, outfitting, and filming of movies on U.S. Forest Land without the required special use authorization). . New Castle Cty. C. § 24.01.014. . See infra notes 252-258. . See, e.g., School Tours, New Castle County Del., http://de-newcastlecounty.dvicplus.com/ 911/School-Tours (last visited'Nov. 15, 2017) (school field trips hosted at Rockwood Park, a historic nineteenth century estate); Rockwood History, New Castle County Del., http://de-newcastlecounty.civicplus.com/1198/ Rockwood-History (last visited Nov. 15, 2017) ("The mission of the site—owned, maintained and operated by New Castle County—is to serve residents and visitors through.education and recreation, while preserving and maintaining the historic 19th Century mansion, its collections and grounds. The county advances that mission by presenting an ongoing variety of youth- and family-friendly public programming in the historic buildings and on the grounds, as well as hosting signature annual events and offering facility rental. The county is committed to [the] past owners’ intention for the unique site'.to benefit the public.”); Carousel Park Equestrian Center, New Castle County Del., http://de-riewcastlecounty.civic plus.com/425/Carousel-Park-Equestrian-Center (last visited Nov. 15, 2017); About Us, New Castle County Del., http://de-newcastle county.civicplus.cóm/966/About-Us (last visited Nov. 15, 2017) (riding lessons available at a 217-acre equestrian center). . Delcastle Recreational Facility, New Castle County Del., http://www.nccde.org/ Facilities/Facility/Details/Delcastle-Recreational-Park-66 (last visited Nov. 15, 2017). To take one example, soccer leagues play at Banning Regional Park, Bonsall Park, Delcastle Recreational Park, Hann Park, Rogers Manor Park, River Road Park, Talley Day Park, and Weiss Park. Soccer Field Directions and Comments, New Castle County Dep’t Cmty. Servs., http://de-newcastlecounty.civicplus. com/DocumentCenter/Home/View/1540 (last visited Nov. 20, 2017); Facilities, New Castle County Del, http://www.nccde.or£yFacilities? clear=False (last visited Nov. 20, 2017). . Tara Lynn Johnson, Sleep Under the Stars at Carousel’s Weekend Camporee, News J. (Wilmington, Del), May 12, 2000 (Take the Rids), at 16 (describing events offered at the inaugural Spring Camporee). . News Release, New Castle County Exec. Office, County Executive Invites Public to Fall Sleep Under the Stars at Carousel Park (Oct. 21, 2015) ("At last year’s Fall Sleep Under the Stars over 5,000 people including families, community and youth groups such as Boy and Girl Scout Troops enjoyed the crafts, entertainment and activities in the great outdoors.”); Fall. Sleep Under the Stars: Carousel Park Equestrian Center, In Wilmington, http;// inwilmingtonde.com/events/fall-sleep-under-stars-0 (last visited Nov. 15, 2017). . New Castle Cty. C. § 24.01.014. . E.g., Christina River Riparian Corridor Guide, New Castle County Del., http://www. nccde.org/DocumentCenter/View/19167 (last visited Nov. 15, 2017) ("No one shall carry any knife having a blade three (3) inches or longer on the grounds. The possession or discharge of BB guns, air guns, firearms, bows and arrows, or any lethal weapon is prohibited.”); Iron Hill Park Trail Guide, New Castle County Del., http://www.nccde.org/Document Center/View/1250 (last visited Nov. 15, 2017) (same). . E.g., Fall Sleep Under the Stars: Carousel Park Equestrian Center, In Wilmington, http:// inwilmingtonde.com/events/fall-sleep-under-stars-0 (last visited Nov. 15, 2017) ("Our goal is to make Sleep Under the Stars a safe and fun event for everyone. To make this possible we ask that you follow these simple rules.... The possession of weapons and firearms are prohibited in New Castle County parks.”). . Kent Cty. C, § 168-35 (1981); see also General Park Rules, Kent County Dep’t Cmty. Servs., http://www.co.kent.de.us/media/ 766210/General-park-rules-2013.pdf (last visited Nov. 20, 2017). Sussex County opened its first county park, Woodland Park, in 2016. Sussex County Comprehensive Plan: County Planning and Zoning Commission, Sussex County 17 (June 16, 2017), https://sussexplan. com/app/uploads/2017/06/Sussex-County-Comp-Plan-PZ-workshop-616-17.pdf. The other parks in Sussex County are state-owned Parks subject to the Regulations. State Parks, Sussex County, https://sussexcounlyde.gov/ state-parks (last visited Nov. 20, 2017). . See supra note 143. . District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008); McDonald v. City of Chicago, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). . Heller, 554 U.S. at 574-75, 128 S.Ct. 2783. . Id. at 574-75, 128 S.Ct. 2783. . Id. at 575-76, 128 S.Ct. 2783. . Id. at 595, 128 S.Ct. 2783. . See United States v. Miller, 307 U.S. 174, 178, 59 S.Ct. 816, 83 L.Ed. 1206 (1939) (holding that the Second Amendment only protected the right to raise a militia); Lewis v. United States, 445 U.S. 55, 65, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980) (same). .See, e.g., Cody v. United States, 460 F.2d 34, 37 (8th Cir. 1972) (the guarantee of the Second Amendment extends only to use related to the preservation of the militia); United States v. Johnson, 497 F.2d 548, 550 (4th Cir. 1974) (the Second Amendment provides only a collective right to bear arms that is related to the preservation of the militia); United States v. Warin, 530 F.2d 103, 106 (6th Cir. 1976) (the Second Amendment applies only to ■ the states’ right to maintain a militia). . Heller, 554 U.S. at 635, 128 S.Ct. 2783, . Id. at 599, 128 S.Ct. 2783 (emphasis added). The bare Heller Majority had no doubt that the Second Amendment that referred in plain terms to having the purpose of protecting from federal overreaching the ability of states to raise militias was understood by "most Americans” to be more important as a federal right to be free from state regulation of gun possession- and use for personal self-defense. Id.- To us, this makes little sense as a textual-focused approach, That is even more the case when the founding generation understood that the English tradition was that any right to bear arms for personal self-defense was subject to Parliamentary restriction. Thus, it made sense for the founding generation to protect .the states from federal action impeding them from raising militias, while leaving to state legislatures, who the founders assumed would be closer to and more- representative of state-level sentiment, the authority, as Parliament had, to regulate possession and use of firearms at the state level. We admit, of cpurse, that whenever law-trained judges, including ourselves, use history in a time-pressured way, based on partisan input, to resolve cases, there is a serious risk of error. But that is why doubts should be resolved in favor of judicial restraint. The most dangerous course of action would seem to be when judges far distant from events discern that they now know much better about what text meant than the preceding generations, who were,- by conventional standards of epistemology, closer in time and thus better positioned to understand what the prevailing meaning of the text was when it ’was adopted. Heller is odd in this and other respects, such as its decision to give the militia purpose no weight and to imply that states and the federal government may ban the sale and ownership óf the weapons that would be most useful to the member of any twenty-first century militia (such as a national guard unit). Heller, 554 U.S. at 599, 128 S.Ct. 2783. In other words, the Heller Majority, in the name of originalism, has denuded the text óf the Second Amendment of any meaning as to its most evident meaning, while employing its own judgment about evolving social policy to make the Second Amendment a tool to restrict state legislatures from playing their historical role in regulating gun possession and use. . Id. at 628-29, 128 S.Ct. 2783 (internal citations omitted), . Id. at 626-27, 128 S.Ct. 2783 (emphasis added). . See Barron v. Mayor of Baltimore, 7 Pet. 243, 248-49, 32 U.S. 243, 8 L.Ed. 672 (1833) (holding that the first eight Amendments to the Federal Constitution only applied to the federal government and did not extend to the states); Slaughter-House Cases, 83 U.S. 16 Wall. 36, 79, 21 L.Ed. 394 (1872) (Second Amendment does not restrict the states); United States v. Cruikshank, 92 U.S. 542, 552, 23 L.Ed. 588 (1875) (same). . McDonald v. City of Chicago, 561 U.S. 742, 750, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). . Id. . Id. at 767-68, 130 S.Ct. 3020. . Id. at 778, 130 S.Ct. 3020, . Id. at 786, 130 S.Ct. 3020 (quoting Heller, 554 U.S. at 626-27, 128 S.Ct. 2783). . We acknowledge that, in 2008, the Department of the Interior revised its rules on the carrying of firearms in national parks to reflect state laws authorizing the possession of loaded concealed firearms, allowing possession for individuals with authority to do so from the state in which the national park is located. But this change to the federal national park regulations was. prompted by a desire to "make every effort to give the greatest respect to the democratic judgments of State legislatures with respect to concealed firearms,” not-Heller. 73 Fed. Reg, 74966-02 (Dec. 10, 2008) (to be codified, at 36 C.F.R. pt. 2 and 50 C.F.R. pt. 27) ("During the pen-dency of bur public comment period, the Supreme Court announced its decision in District of Columbia v. Heller, which held that the Second Amendment protects an individual’s right to possess a firearm unconnected with service in a government militia, and to use that firearm for traditionally lawful purposes, such as self-defense within the home. Several individuals, including two members of Congress, wrote the Department suggesting that the Court’s decision in this case is of significance to the proposal, and that the Department should extend the public comment period to allow citizens to comment on the potential impacts of this case on the proposed rule. In our view, the Supreme Court’s decision in Heller does not directly impact our proposal to revise existing Federal regulations to more closely conform our regulations .to appropriate state laws.”). . Doe v. Wilmington Hous. Auth., 88 A.3d 654 (Del. 2014). . Id. at 659. . Doe v. Wilmington Hous. Auth., 880 F.Supp.2d 513, 528 (D. Del. 2012). . Id. at 528. . Doe v. Wilmington Hous. Auth., 88 A.3d at 659. . Doe v. Wilmington Hous. Auth., 880 F.Supp.2d at 531. . Id. at 518. . Id. at 539 (citing Novosel v. Nationwide Ins. Co., 721 F.2d 894, 897 (3d Cir. 1983)). . Id. at 535. . Id. at 536-37. . Id. at 537-38. . Id. . Doe v. Wilmington Hous. Auth., 88 A.3d 654, 661 (Del. 2014). . Doe v. Wilmington Hous. Auth., 568 Fed. Appx. 128, 128-29 (3d Cir. 2014). . Doe v. Wilmington Hous. Auth., 88 A.3d at 667. . Id. at 668. . Id. . Id. at 668-69. . Id. at 665 n.47. . Id. at 665. . Id. at 661, . Id. at 668. . Id. . Id. . Id. at 667. . Id. at 668 (acknowledging that the common areas, described as the laundry rooms and TV rooms, are similar to the spaces within a private residence, but not considering the effect of the lease provisions on spaces where children might gather, such as the computer rooms where residents’ children complete their homework). . Heller, 554 U.S. 570, 628-29, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (internal citations omitted). . Doe v. Wilmington Hous. Auth., 88 A.3d at 667-68 (“In Griffin v. State we explained that an individual’s interest in the right to keep and bear arms is strongest when 'the weapon is in one's home or business and is being used for security.’ Residents have a possessory interest in both their apartments and the common areas. And although Residents cannot exclude other residents or the public from the common areas, their need for security, in those areas is just as high for purposes of Section 20 as it would be inside their apartment ór business.’’) (internal citations omitted), ■ . Del. Const., art. I, § 20 (198.7). . 11 Del. C. § 466 ("The use of deadly force for the protection of property is justifiable ’ only if the defendant believes -that: (1) The person against whom the force 'is used is attempting to dispossess the defendant of the defendant’s dwelling otherwise than under a claim of right to its ‘possession; or (2) The person against whom-the deadly force is used is attempting to commit arson, burglary, robbery or felonious theft or property destruction and either: • a. - Had employed or threatened deadly force against or in the presence of the defendant; or b. Under the circumstances existing at the time, the defendant believed the use of force other than deadly force would expose the defendant, or another person in the defendant’s presence, to the reasonable likelihood of serious physical injury.”). . See, e.g., .“Castle Doctrine" Self-Defense Law, NRA . Institute for Legislative Action (Apr. 26, 2005), https://www.nraila.org/ articles/20050426/castle-doctrine-self-defense- . law (quoting former NRA president Marion Hammer "This law is about affirming that your home is your castle and, in Florida, you have a right to be absolutely safe inside its walls.”). . Compare Del. Const., art. I, § 13 (1987) ("A person has the right to keep and bear arms for the defense of self, family, home and State, and for hunting and recreational use..”) with W.V. Const., art. Ill, § 22 (1986) ("A person has the right to keep arid bear arms for the defense of self, family, home and state, and for lawful hunting and recreational use.”) and Kan. Const., Bill of Rights § 4 (2010) (“A ■ person has the right to keep and bear arms for the defense of self, family, home and state, for lawful hunting and recreational use, and for any other lawful-purpose.”). . Cf Colo. Const., art. I, § 15 (1876) ("The right of no person to keep and bear arms in defense of his home, person, and property or in aid of the civil power when thereto legally summoned, shall be called in question ....”); Miss. Const., art. III,. § 12 (1890) ("The right ’of every citizen to keep and bear arms in . defense of his home, person, or property or in aid of the civil power when thereto legally summoned, shall not be called into question ....”); Mo. Const., art. I, § 23 (1945) ("That the right of every citizen to keep and bear arms ... in defense of his home, person family and property, or when lawfully summoned in the aid of the civil power, shall not be questioned."); Mont. Const., art. II, § 12 (1889) ("The right of any person to keep or bear arms in defense of his home, person, and property, or in aid of the civil power when thereto legally summoned, shall not be called into question ....”); Neb. Const., art. I, § 1 (1988) ("All persons ... have certain inherent and inalienable rights; among these are ... the right to keep and bear arms for security and defense of self,-family, home, and others, and for lawful common defense, hunting, recreational use, and all other lawful purposes .... ”); Okla. Const., art. I, § 4 (1907) (“The right of a citizen to keep and bear arms in defense of his home, person, or property, or in aid of the civil power, when thereunto legally summoned, shall never be prohibited ....”). . Cf. N.H. Const., pt. 1, art. 2-a (1982) ("All persons have the right to keep and bear arms in defense of themselves, their families, their property and the state.”); N.D. Const., art. I, § 1 (1984) (“All individuals ... have certain inalienable rights, among which are ... to keep and bear arms for the defense of their person, family, property, and the state, and for lawful hunting, recreational, and other lawful purposes, which shall not be infringed.”); Utah Const., art. I, § 6 (1984) (“The individual right of the people to keep and bear arms for security and defense of self, family, others, property, or the state, as well as for other lawful -purposes shall not be infringed; but nothing herein shall prevent the legislature from defining the lawful use of arms.”). . Doe v. Wilmington Hous. Auth., 88 A.3d 654, 665 (Del. 2014). . Majority Op. 639 n.25; 11 Del C. § 1441. . 18 U.S.C. §§ 926c-926b (2015). . 18 U.S.C. §§ 926c-926b; 11 Del. C. §§ 1441A-1441B (emphasis added). . 80 Del. Laws ch. 161 (2016); Sec. Order No. 2016-P-0006 (Feb. 15, 2016). . See supra note 8. . Appellants’ Amend. Opening Br. 12 (“But for the Regulations adopted by the Agencies, the Sportsmen would exercise their State constitutional rights to keep and bear firearms within Delaware State Parks and State Forests.”). . Id. at 1-2. . Id. at 1 n.3 (“This ban covers expensive cabins that can be rented at State Parks for weeks at a time to house families.”); id. at 9-10, 26. . Id. at 12. . Id. at 6. . Id. . Id. at 15. . See Programs at Delaware State Paries, Del. State Parks, http://www.destateparks. 'com/programs/index.asp (last visited Sept 8, 2017) (overview of public programs, school group programs, scout programs summer camps, and school break day camps offered in ■ state parks); see also Annual Report' 2016, Del. Forest Serv. 21-22 (2016), http:// delawaretrees.com/dfs_fyl6_annualreport.pdf (description of school groups and community organizations making use of state foreste in 2016). . See How to Plan a State Park Field Trip, Del. State Parks, http://www.destateparks. com/school/plan.asp (last visited Sept. 8, 2017). . See Summer Camps at Delaware State Parks, Del. State Parks, http://www.destate parks.com/programs/summer-camps/index. asp (last visited Sept. 8, 2017) ("Half-day camps for four- to six-year-olds with various nature themes are offered in summer, as well as full-day camps for six- to seventeen-year-olds. Many camps offer before and after care. Summer camp information is posted in January. Single- or multi-day school break camps keep kids interested, active and learning when school is closed during the school year.”). . Delaware State Parks 2016 Annual Report 11, 13 (2016), http://destateparks.com/FY 20Í6/AnnualReport.pdf; Kickball, Del. Sports League, https://www.delawaresportsleague, com/leagues/kickball (adiilt kickball league competes at Alapocas Run State Park); Schedule Entrance Fees & User Charges, Div. Parks & Recreation (2017), http://www.destate parks.com/downloads/fees/2017RatesFees Charges.pdf (fee to rent football or soccer fields for youth athletics); Registration, Beach 5 Sand Soccer Series, http://www.beach5sand soccerseries.com/registration5.php (last visited Nov. 21, 2017) (“best beach soccer tournament on the east coast”, with both "youth and adult divisions” at Dewey Beach, Delaware, among other locations); Boys’ Soccer—Varsity Schedule, St. Georges Tech. High Sch„ https://www.hawkssports.com/page9435 (last visited Nov. 21, 2017) (listing Cape Henlopen State Park as one of the team’s scheduled practice locations). . See Delaware State Parks: Historic Elegance, Rustic Charm, Seaside Romance (2016), http://pubs.hawthorncreative.com/delaware stateparks/ (state park sites available for weddings); Annual Report 2016, Del. Forest Serv. 21-22 (2016), http://delawaretrees.com/dfs_fy 16_annualreport.pdf (events held by community organizations in Forests). . See generally Activities in Delaware State Parks, Del. State Parks, http://www.destate parks.com/activities/index.asp (last visited Sept. 8, 2017) (activities offered in Párks include adventure racing, biking, mountain biking, birding, camping, disc golf, fishing, geocaching, golf, hayrides, hiking, horseback riding, hunting, music and arts, paddling, picnicking, rock climbing, rappelling, stargazing, summer camps, summer concerts, swimming, and tennis); Delaware State Forests, Del. ■ Forest Serv., http://dda.delaware. gov/forestry/forest.shtml (last visited Sept. 9, 2017) (activities offered in Forests include hiking, horseback riding, hunting, running, bicycling, cross-country siding, primitive camping, picnicking, and fishing). . In 2016, the Forests welcomed “an estimated 26,565 visitors [who] logged 26,238 user-days with such popular activities as hunting, wildlife observation, hiking, and horseback riding” and the state forests reported 97,479 participants to state park nature centers and historic buildings and 47, 414 participants in the state park summer concerts. Annual Report 2016, Del. Forest Serv. 2 (2016), http://delawaretrees.com/dfs_fy 16_ annualreport.pdf; Delaware State Parks 2016 Annual Report 11, 13 (2016), http://destate parks. com/FY2 016/AnnualReport .pdf. . Appellants! Amend. Opening Br. 6-7, 43; see Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450-51, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) ("Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of ‘premature interpretation of statutes on the basis of factually barebones records.’ Facial challenges-also run contrary to the fundamental principle of judicial restraint that courts should neither ‘anticipate a question of constitutional law in advance of the necessity of deciding it' nor 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied,’ Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind 'that '[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.' ”) (internal citations omitted). . Reno v. Flores, 507 U.S. 292, 315, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (quoting Schall v. Martin, 467 U.S. 253, 281, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984)). . Id. at 301, 104 S.Ct. 2403 (citing United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)); Salerno, 481 U.S. at 745, 107 S.Ct. 2095 ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.”). . Hazout v. Tsang Mun Ting, 134 A.3d 274, 287 n.43 (Del. 2016) (gathering authorities showing the great caution that must be used in addressing a facial challenge); Boilermakers Local 154 Ret. Fund v. Chevron Corp., 73 A.3d 934, 948-49 (Del. Ch. 2013) (“[T]he plaintiffs’ burden on this motion challenging the facial statutory and contractual validity of the bylaws is a difficult one: they must show that the bylaws cannot operate lawfully or equitably under any circumstances.... The plaintiffs voluntarily assumed this burden by making a facial validity challenge, and cannot satisfy it by pointing to some future hypothetical application of the bylaws that might be impermissible."). . Justice v. Gatchell, 325 A.2d 97, 102 (Del. 1974) (citing State Highway Dep’t v. Del. Power & Light Co., 167 A.2d 27 (Del. 1961)). . E.g., Ringler v. Paintin, 1980 WL 332988, at *2-3 (Del. Super. July 24, 1980) (“As rules and regulations enacted by administrative agencies pursuant to the powers delegated to them have the force and effect of laws, the traditional test provides the applicable framework for our analysis.”) (internal citations omitted). . Stevenson v. Del. Dep’t of Nat. Res. & Envtl Control, 2014 WL 4937023, at *7 (Del. Super. Sept. 22, 2014) (citing 29 Del. C. § 10141)). “Agency action” includes an agency’s regulation, defined as “any statement of law, procedure, policy, right, requirement or prohibition formulated and promulgated by an agency as a rule or standard, or as a guide for the decision of cases thereafter by it or by any other agency, authority or court.” 29 Del. C. §§ 10102(2), (7). . Council 81, Am. Fed’n of State, Cty. & Mun. Emps., AFL-CIO v. State of Del., Dep’t of Fin., 293 A.2d 567, 571 (Del. 1972) (In interpreting an ambiguous statute, the Court will "give due weight to the practices and policies existing at the time [Section] 2713 was enacted and which continued thereafter for 17 years. A long-standing, practical, and plausible administrative interpretation of a statute of doubtful meaning will be accepted by this Court as indicative of legislative intent.”) (citations omitted); Harvey v. City of Newark, No. 5023-VCS, 2010 WL 4240625, at *6 (Del. Ch. Oct. 20, 2010) ("Similarly, when a statute has been applied by the relevant government organ in a consistent way for a period of years, that is strong evidence in favor of interpreting the statute in accordance with that practical application.”). . Giuricich v. Emtrol Corp., 449 A.2d 232, 239 n.13 (Del. 1982). . Jackson v. Danberg, C.A. No. 07M-09-141 RRC, 2008 WL 1850585, at *4 (Del. Super. Apr. 25, 2008). . Watson v. Burgan, 610 A.2d 1364, 1367 (Del. 1992) ("[T]he original regulation adopted by the Department remained in effect for fourteen years without interference by the General Assembly. Such inaction may well constitute acquiescence and be indicative of legislative intent. More importantly, the Department’s parole eligibility regulation was implicitly adopted by prosecutors, defense lawyers and judges throughout the State in the negotiation of guilty pleas.”). . State v. Blount, 472 A.2d 1340, 1346 (Del. Super. 1984) ("Furthermore, the Court must, and should, keep in mind the principal of statutory construction which has been followed by courts from time immemorial: that a statute will be presumed to be constitutionally firm unless the evidence is clearly to the contrary. Thus, a party asserting the unconstitutionality of a statute must show that the question of the constitutionality of the statute is fairly debatable. Moreover, once a party has established that the constitutionality of the statute is fairly debatable, he must, in order to overcome the presumption of constitutionality, establish clearly and convincingly the' lack of constitutionality of the statute.”) (internal citations omitted); see generally City of Chicago v. Morales, 527 U.S. 41, 77-81, 119 S.Ct. 1849, 144 L.Ed.2d 67 (Scalia, J., dissenting) (“[Bjefore declaring a statute to be void in all its applications (something wé should not be doing in the first place), we have at least imposed upon the litigant the eminently reasonable requirement that he establish that the statute was unconstitutional in all its applications.”). .The Majority points to some arguable inconsistencies in the General Assembly’s regulation of firearms to support its conclusion that the Regulations "are grossly out of step with the types of ‘place’-based restrictions adopted by our General Assembly.” Majority Op. 657. That our General Assembly has not been consistent in all respects in the regula- ■ tion of weapons does not distinguish this subject form most others. Legislating is complex, and arguable or genuine inconsistencies can crop up in many areas. The Judiciary is not charged with writing judicial decisions that correct that. As we show, if anything, the General Assembly’s action acknowledges the validity and existence of the Regulations. . Public Protected Lands, Del, Open Data, https://data.delaware.gov/Recreation/Public Protected-Lands/whe2-8n4h/data (last visited Oct. 28, 2017) (mapping Delaware's Outdoor Recreation Inventory of state owned lands). . Ezell v. City of Chicago, 651 F.3d 684, 702 (2011) ("Accordingly, if the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as ⅛ was understood at the relevant historical moment—1791 or 1868—then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review."). . Doe v. Wilmington Hous. Auth., 88 A.3d 654, 668 (Del. 2014). .In Heller, the word "longstanding” only qualified one set of restrictions,- and not those involving sensitive places, 554 U.S. at 626-27, 128 S.Ct. 2783 ("Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.”); id. at 626, 128 S.Ct. 2783 n.26 ("We identify these presumptively lawful regulatory measures only as examples;- our list does not purport to be exhaustive,”). McDonald reaffirmed this part' of Heller, but moved the term "longstanding” to the front of a list including regulation of sensitive places. McDonald v. City of Chicago, 561 U.S. 742, 786, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) ("We made it clear in Heller that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,’ ‘laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.’ ”) (internal citations omitted), .80 Del. Laws ch. 161 (2016); Dep’t of Nat. Res. & Envtl. Control, Approving Final Regulations to Amend 7 DE Admin. Code § .9201: Regulations Governing State Parks, Secretary's Order No.: 2016-P-0006 2 (Feb. 15, 2016) ("The primary purpose of this proposed regulatory promulgation is to adopt as final the aforementioned proposed revised Amendments to 7 DE Admin. Code § 9201, Regulations Governing State Parks ... to mirror the recent changes made to Delaware law as a result of the passing of Senate Bill .114 ... by the 148th General Assembly in 2015. This bill declassifies a number of minor violations associated with state parks by changing some violations from an unclassified misdemeanor to a Class ‘D’ ”, environmental violation.”), The Park Regulation is mow a Class D environmental violation. Id, at 28. . Doe, 88 A.3d at 666-67.- . 7 Del, C. § 4701(a)(4) (authorizing .DNREC to “[m]ake and enforce regulations relating to the protection, care ánd use of the areas it administers”); 3 Del C. § 1011 (authorizing DOA to '.'execute áll matters pertaining to forestry within the jurisdiction of the State; devise and promulgate rules and regulations for the enforcement of the state forestry laws and' for the protection of forest lands, and impose fines in furtherance thereof”). . It is- not unusual -to say that places where children play and firearms do not mix. See Tingle v. Ellis, No. Civ.A 97C-11-020, 1999 WL 743651, at *4 (Del. Super. Aug. 10, 1999) ("The goal of [Section 1456 of Title 11, which criminalizes unlawfully allowing a minor access to a firearm] is to keep firearms from minors who might injure themselves-or others in operating or handling a firearm.”); People v. Heber, 745 N.Y.S.2d 835, 839 (2002) ("Because of a growing public concern regarding the accidental shootings of children in the homes of gun owners, 18 states have enacted safe storage laws for firearms. Known as Child Access Prevention (‘CAP’) laws, most of the statutes generally make it a crime for a gun owner to store a loaded firearm in a manner in which he knows or reasonably should know a child may gain access to the weapon[,] If a child does gain access to the gun and uses it to inflict injury or death upon him/herself or another person, the gun owner is held criminally liable.”). That firearms can be dangerous, or at least perceived as such, is also understood. See generally Embody v. Ward, 695 F.3d 577, 579 (6th Cir. 2012) (noting that Embody, carrying an AK-47 in a Tennessee state park, "anticipated his appearance at the park would attract attention” and confirming that park visitors reported his presence to park rangers); Dep’t of Nat. Res. & Envtl. Control, Approving Final Regulations to Amend 7 DE Admin. Code § 9201: Regulations Governing State Parks, supra note 276 (classifying mechanical bait casters as firearms and stating, “beaches are frequently at capacity, and anglers are in close proximity of each other. The Department has safety concerns for other users groups in .such areas, such as kayakers, walker, body surfers and swimmers, when a device such as this is being operated within such close proximity. Moreover, operator error with such a device draws additional safety concerns when used on Division-managed lands. The Department notes that just one individual improperly using such a device could severely injur[e] or kill other recreational users of the park.”). .Majority Op. 636 (“Appellants challenge two regulations adopted by two different State agencies that result in a near total ban of firearms in Delaware’s state parks and forests.’’). . See supra note 22; see also United States v. Marzzarella, 614 F.3d 85, 91 (3d Cir. 2010) ("The District of Columbia’s handgun ban is an example of a law at the far end of the spectrum of infringement on Second Amendment rights. It did not regulate possession of handguns: it prohibited it, even for the stated fundamental interest protected by the right— the defense of hearth and home.”) (internal citations omitted). . See, e.g., Calguns Found., Inc. v. Cty. of San Mateo, 218 Cal.App.4th 661, 678, 160 Cal.Rptr.3d 698 (2013) (finding an ordinance prohibiting the possession and use of guns in county parks was not a total ban because, unlike a citywide or countywide prohibition on handgun possession in San Francisco, this ordinance "merely regulate[d] the possession or use of firearms on county property.") (discussing Fiscal v. City & Cty. of S.F., 158 Cal.App.4th 895, 70 Cal.Rptr.3d 324, 338-39 (2008)). . Del. Dep’t Nat. Res. & Envtl. Control, Park Rules and Regulations § 8.04 (1977); Del. Dep't Agric. § 7.9 (2003); 3 Del. Admin. C. § 402-3.2. . Appellants’ Amend. Opening Br. 19-20. . Doe v. Wilmington Hous. Auth., 88 A.3d 654, 667 (Del. 2014). . Id. at 668 (emphasis added). . McDonald v. City of Chicago, 561 U.S. 742, 744, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (quoting District of Columbia v. Heller, 554 U.S. 570, 628, 128 S.Ct. 2783 (2008)) (internal citations omitted), . See, e.g., Hall v. Garcia, No. C 10-03799 RS, 2011 WL 995933, at *2 (N.D. Cal. Mar. 17, 2011) (upholding a prohibition on firearms near school property, explaining "[i]t is evident beyond the need for elaboration that a State’s interest in ‘safeguarding the physical and psychological well-being of a minor’ is ‘compelling,’" and reiterating that that the United States Supreme Court has "sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights”) (quoting New York v. Ferber, 458 U.S. 747, 756-57, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)); United States v. Masciandaro, 638 F.3d 458, 473 (4th Cir. 2011) (finding that "the government has a substantial interest in providing for the safety of individuals who visit and make use of the national parks” and noting that "large numbers of people, including children, congregating] for recreation, ... justifies] reasonable measures to. secure public safety”); GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers, 212 F.Supp.3d 1348, 1369 (N.D. Ga. 2016) (finding that the "Army Corps undoubtedly has a substantial interest in ‘providing the public with safe and healthful recreational opportunities while protecting and enhancing [its] resources’ ”) (quoting 36 C.F.R. § 327.2)); Bonidy v. U.S. Postal Service, 790 F.3d 1121, 1125-26 (10th Cir. 2015), cert. denied, — U.S. —, 136 S.Ct. 1486, 194 L.Ed.2d 550 (2016) (finding that USPS’s desire to "creat[e] a safe environment for its patrons and employees” was an important governmental interest). In fact, it appears no other courts have objected to general safety concerns when analyzing important government interests under intermediate scrutiny. . Appellants’ Amend. Opening Br. 27-28; Appellants’ Corrected Reply Br. 12. . Appellants’ Amend. Opening Br. 19-20 (citing Moore v. Madigan, 702 F.3d 933, 938-39 (7th Cir. 2012)). . Majority Op. 649 ("More than two decades later, the United States Supreme Court’s decisions in District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and McDonald v. City of Chicago, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), finally settled the questions that had served as an impetus for Section 20.”). . Distinguished scholars have reviewed the arguments of pro-gun advocates that firearm regulation in the United States and elsewhere has not been associated with lower rates of violence and homicide. Their comprehensive analysis contradicts that assertion and provides evidence that governmental regulation of firearm possession and use can be effective in reducing violence. See, e.g., John Donohue & Ian Ayres, Shooting Down the More Guns, Less Crime Hypothesis, 55 Stan. L. Rev. 1193 (2003); see also John J. Donohue IlI.et ah, Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Controls Analysis, (Stanford Law and Economics Olin Working Paper No. 508, Columbia Business School Research Paper No, 17—67, Stanford Public Law Working Paper), https://papers.ssm.com/ sol3/Delivery,cfm/SSRN_ID3034416_code 445373.pdf?abstractid=2990220&type=2. This is despite the fact that states and localities with gun control legislation in the United States must deal with the reality that if their neighboring jurisdictions do not enact gun control legislation, guns can find their way to the mentally ill and those with criminal records in jurisdictions that do not limit their access. In addition, .guns (for example, those that can act like a machine gun) that are not legal in their jurisdictions can travel in from neighboring jurisdictions that allow that type of weapon. On a comparative basis, compelling evidence exists that the higher prevalence of firearms in the United States results in a level of gun violence far exceeding similar nations. The United States has far more guns per capita than the nations we consider similar to our own. German Lopez, Ted Cruz Accidentally Explained America's Gun Problem in One Sentence, Vox (Nov. 7, 2017), https://www.vox.com/policy-and-politics/2017/ 11/6/16615218/ted-cruz-gun-control-sutherland-springs-texas-shooting (reporting that in the United States, there are an average of eighty-nine guns per one hundred people, as compared to, for example, thirty-one guns per one hundred people in Canada, fifteen guns per one hundred people in Australia, six guns per one hundred people in England and Wales, and six-tenths of a gun per one hundred people in Japan), Consistent with the greater prevalence of guns, Americans suffer far more deaths by gun per capita than our friends in ally nations. Id. (in the United States, there are an average of 2.97 gun-related homicides per one hundred thousand people, as compared to, .for example, 0.51 gun-related homicides per one hundred thousand people in Canada, 0.14 gun-related homicides per one hundred thousand people in Australia, 0.07 gun-related homicides per one hundred thousand people in England and Wales, and 0.01 gun-related homicides per one hundred thousand people in Japan). The explanation that the prevalence of firearms explains those differences is more savory than assuming that Americans are just more Violent and murderous than Europeans, Asians, Canadians, or Australians. . We also note that the penalties associated with a violation of the Regulations are modest. For example, a Park Regulation violation is classified as an environmental misdemean- or that subjects a first-time violator to a fine between fifty and one hundred dollars, and a Forest Regulation violation, an unclassified misdemeanor, subjects a first time violator to a fine between twenty-five and two hundred and fifty' dollars'. 7 Del'. Admin. C. § 9201-25.0; 3 Del. Admin. C. § 402.10.0. . Dei.. Dep’t Nat, Res. & Envtl. Control, Park Rules and Regulations § 8.04 (1977); Del. Dep’t Agric., State Forest Regulations § 7.9 . (2003); 3 Del. Admin. C. § 402-3.2. . Majority Op. 658-59 ("Although there certainly could be some ‘sensitive’ areas in State Parks and State Forests where the carrying of firearms may be restricted, as is done in certain areas of National Parks, there is no record here.that the State has undertaken any effort to delineate such areas so as not to infringe on Section 20 rights.”) (internal citations omitted).. . The Majority argues that the Agencies lack'the authority to adopt the Regulations. But, they do not deny that the Agencies have the authority to regulate when visitors can enter the Parks and Forests, to limit activities such as the use of liquor, or to require visitors to pay entry and license fees. The Majority even admits that the Agencies can regulate firearm possession and use,in the Parks and Forests, but just must do so more narrowly. In other words, all the Majority contends is that no agency may adopt a regulation that violates our Constitution. We agree with that, but do not agree that these Regulations run afoul of Section 20. . See, e.g, Warden v. Nickels, 697 F.Supp.2d 1221, 1229 (W.D. Wash. 2010) (upholding a prohibition on firearms at certain parks and facilities, finding the prohibition was valid because parks "where children and youth recreate” were sensitive areas, and explaining that, just as the government does not want weapons in courthouses and government' buildings, "the City does not want those with firearms entering certain parks where children and youth are likely present”); United States v. Masciandaro, 638 F.3d 458, 473 (4th Cir. 2011) (applying intermediate scrutiny, upholding a ban prohibiting loaded guns in vehicles within a national park area, 'finding that "the government has a substantial interest in providing for the safety of individuals who visit and make use of the national parks,” and explaining that the national parks are an "area where large numbers of people, including children, congregate for recreation,” which justified implementing "reasonable measures to secure public safety”); GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers, 212 F.Supp.3d 1348, 1372-73 (N.D. Ga. 2016) (applying intermediate scrutiny and finding the “high density of visitors, use of recreational facilities, the various potential sources of conflict among visitors, and limitations on the Corps’ ability .to police its own properties, restricting visitors’ authority to carry loaded firearms helps Defendant Army Corps maintain public safety and the security of infrastructure on those properties"); Bonidy v. U.S. Postal Service, 790 F.3d 1121, 1125-26 (10th Cir. 2015), cert. denied, — U.S. —, 136 S.Ct. 1486, 194 L.Ed.2d 550 (2016) (explaining that "the fact that the government is acting in a proprietary capacity, analogous to that of .a person managing a private business” was relevant because the government has "more flexibility to regulate when- it is acting .as a proprietor” and finding that the ban is was substantially "relevant to the USPS’s business objectives, which include[d] providing a safe .environment for its patrons and employees”); Hall v. Garcia, No. C 10-03799 RS, 2011 WL 995933, at *2 (N.D. Cal. Mar. 17, 2011) (upholding a prohibition on carrying weapons within one thousand feet of school property and finding that it was "beyond the need for elaboration that a State’s interest in safeguarding the physical and psychological well-being of a minor is compelling,” and thus survived intermediate scrutiny”); see also Embody v. Ward, 695 F.3d 577, 581 (6th Cir. 2012) ("No court has held that the Second Amendment encompasses a right to bear arms within state parks.”). . Our colleagues in the Majority take issue with our dissent in several ways. We will not endeavor an extensive response to each, but suffice with this footnote. For example, the Majority argues that we focus on the state of English law only in 1977, not as of the time of Delaware's founding. But we show that, as of our founding, any English right to bear arms was subject to restriction and regulation by Parliament, the equivalent of our General Assembly, and we show how by 1977, Parliament had used that power to regulate the ownership and possession of firearms. See supra Part IV, Section F. The Majority also suggests that our view that our government may create havens for recreation and family time that are weapons-free somehow portends its ability to restrict freedom of speech, and even engage in viewpoint discrimination. Nothing, of course, in our opinion suggests such a thing, and the reality is that even as to free speech, the government as a proprietor has the right to limit where and when speech may be exercised, and that government operates all kinds of properties (schools, courthouses and judicial chambers, museums, libraries, police stations) where no one has the right to come and just give a speech. When lethal force is present, an increased danger to others always exists, as recent events show. See, e.g., Marwa Elta-gouri, Man Accidentally Shoots Himself and His Wife at a Church, Shortly After a Discussion on Shootings, Wash. Post (Nov. 17, 2017), https://www.washingtonpost.com/news/acts-of-faith/wp/2017/11/17/a-man-accidentally-shot-himself-and-his-wife-at-a-church-shortly-after-a-discussion-on-shootings/; Marwa Elta-gouri, He Thought He Saw a Deer and Fired His Pistol. Now His Neighbor is Dead, Wash, Post (Nov, 24, 2017), https://www.washington post.com/news/animalia/wp/2017/11/24/he-thought-he-saw-a-deer-and-fired-his-pistol-now-his-neighbor-is-dead/?utm_term=.bd2 afbb0af29. That is not true of an expression of an opinion. But, even in our Parks and Forests, you cannot just hold a rally on the softball field or in the trout stream, On this point, another reality exists. It was long understood that government could restrict gun possession on its property or even near it, supra note 56 (citing Lois G. Schwoerer, Gun Culture in Early Modern England 59, 61 (2016) (identifying laws prohibiting the carrying of small handguns within the royal court or a three-mile radius of it)), because of the obvious dangers lethal force presents,' and as we show, Section 20 was adopted on the basis of accepting traditional restrictions on firearm possession and use, which included those that allowed the government to restrict firearm possession and use on its own lands. To this, even McDonald went out of it way to disclaim any "doomsday” reading of its reasoning, and to assure that it “does not imperil” all regulations of firearms, including longstanding regulations on the possession and ownership of guns, like the ones at issue here. McDonald v. City of Chicago, 561 U.S. 742, 787, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010).